Fabricant, Judith, J.
INTRODUCTION
This action arises from a long-term lending relationship between Bank of America and its predecessors (the bank) and Cobblestone Corporation of Northern New England, Inc. (CCNNE). CCNNE defaulted on its debt to the bank in the amount of $20.5 million. The bank seeks to recover its loss from CCNNE’s individual principals,[1] as well as from BDO Seidman (BDO), which audited financial statements for CCNNE’s parent corporation, and for CCNNE for certain years.[2] The Court conducted a juiy-waived trial over 23 days, beginning on September 8, 2011, and ending on October 13, 2011. Exhibits received in evidence during the trial numbered 1,672.[3] After completion of the evidence, the Court allowed the parties additional time to submit proposed findings and rulings. As of December 22, 2011, the Court has received proposed findings from all active parties, along with a stipulation of all those parties as to certain facts, and a separate stipulation as between the bank and BDO, in which the individual defendants do not join.[4] Based on the credible evidence presented at trial, and having considered the arguments of the parties, the Court finds and rules as follows.
I. FINDINGS OF SUBSIDIARY FACTS
1. The Seders and Their Business.
Prior to any of the events in issue in this case, brothers Larry and Jim Seder each had several decades of experience in the lending and equipment leasing business. Each also had substantial relevant education, Larry an MBA and Jim a law degree.[5] The brothers (particularly Larry) had developed strong relationships with senior executives at the bank’s predecessors, who regarded the Seder brothers as trustworthy, competent, and experienced in the lending business.
The two brothers formed Redes Holding Corporation in 1990, each owning 50%. Redes purchased Cobblestone Corporation, a lending and leasing company, from what was then First Mutual Bank of Boston. Cobblestone formed CCNNE. Over the next twenty-some years, the Seder brothers conducted a lending and equipment leasing business through CCNNE,[6] funded by a revolving loan provided by the series of banks that has become the bank that is the plaintiff here.[7] CCNNE’s customers were generally small businesses whose credit history fell below lending standards for banks.[8] Aside from the funds it borrowed from the Bank, CCNNE’s income consisted of the loan payments it received from its customers. Its profits consisted of the difference between its own borrowing costs (and other operating costs, including the Seders’ salaries) and the higher interest its customers paid. Its assets consisted almost entirely of its accounts receivable — that is, the anticipated stream of payments under its outstanding loans and leases.
Larry Seder held the primary decision-making and deal-making role at CCNNE. He solicited business, formed relationships with customers, evaluated their creditworthiness, and negotiated terms. He also played the primary role in CCNNE’s relationship with the bank. Jim Seder was primarily responsible for documentation of transactions, but also participated in management and in interactions with the bank. Both Larry and Jim had full access to all CCNNE’s files and information at all times. Both kept track of the status of significant customer accounts, including any delinquencies.
Robin Seder Isenberg, Larry’s daughter, joined the business in 1992, after her graduation from college. She performed bookkeeping, accounting, data entry, and similar functions, and prepared and signed various reports submitted to the Bank. Although she had minimal business experience, and her only relevant training consisted of introductory accounting courses, she eventually came to hold the title of Chief Financial Officer. She took direction in her work from her father and uncle, and as to accounting matters, from BDO.[9] She served as CCNNE’s primary contact with BDO, although Larry and Jim Seder also interacted with BDO and were fully informed of its activities. Isenberg *515 did not overstate her credentials or experience, either to the bank or to BDO; both were generally aware of her level of sophistication.
CCNNE’s approach to lending emphasized personal relationships. It had no formal or systematic underwriting standards or processes; Larry Seder made decisions based on his assessment of a customer’s business plan, its assets, and its principals.[10] CCNNE generally obtained security interests in equipment, accounts receivable, or other collateral for loans, and filed UCC financing statements to reflect its interests, but it did not obtain appraisals of collateral. Nor did it obtain Dun & Bradstreet reports on its customers, or their financial statements or tax returns. It sometimes obtained personal guarantees from principals of its customers, but it did not do so consistently, and did not obtain financial statements from those individuals or credit reports on them. CCNNE’s primary concern, in its relationships with its customers, was that they pay interest, if not when due then eventually, since interest payments were the source of its income and profits. CCNNE had less concern for repayment of principal, since its outstanding customer contracts were its primary (if not sole) assets.
Larry Seder was the one to decide how to handle any difficulties with customers. He made those decisions, like his initial lending decisions, based on his personal evaluation of the customer and its circumstances. He rarely declared a customer in default and proceeded to foreclose on pledged assets. Rather, his usual approach to a customer’s inability to pay was to lend it additional money.[11] Sometimes that kind of loan was structured as a “payment in kind” or “PIK” note — that is, the customer made its interest payment to CCNNE in the form of a note. Sometimes such a transaction was structured as a rewriting (essentially a cash-out refinancing) of the original loan or loans— that is, one or more new loans would be issued to pay off the old loan or loans, along with accumulated interest. The result of either iype of transaction was that the total principal of the loan would increase, while the value of the collateral would not.
Sometimes, if Larry came to believe that the original customer or its principals were no longer in a position to perform and would not become so, he would identify some other person or entity, often an entity formed by an employee of the original customer or a family member of its principals, to take over. In such instances, a loan would be issued to the new customer to pay off the loans to the previous customer, along with accumulated unpaid interest, and the new customer would take possession of either the equipment or the entire ongoing business of the previous customer. Such transactions would tend to result in loans with principal amounts that would far exceed the value of the collateral. To enable the customers to make the required on-going payments, often these loans were structured such that payments were drawn out over a long term or deferred for a substantial period of time, with a large balloon payment some years off.
Larry had (and still has) great faith in his ability to evaluate his customers and, if necessary, to make advantageous deals. His confidence sometimes proved well-founded. In some instances, the additional funding provided by CCNNE to a customer that was having temporaiy trouble enabled the customer to expand its business and eventually to pay off its entire debt. In some other instances, Larry succeeded in arranging a transaction in which a genuinely separate entity would purchase a customer’s ongoing business and pay off its loans entirely. Over time, however, and with the worsening of economic conditions in the early 2000s, these kinds of successes became less frequent. CCNNE’s business became increasingly concentrated in a small number of customers, whose loans far exceeded the value of the collateral, as a result of repeated refinancing transactions of various kinds. CCNNE’s total reported assets — that is, the nominal value of its accounts receivable — continued to grow, but the security for those accounts did not. As long as CCNNE could keep borrowing ever increasing amounts from the bank, to fund its ever increasing loans to customers who otherwise could not make their payments, it appeared to be profitable and growing. But if the bank were to cut it off, and it could not refinance with another lender, its house of cards would collapse.
At least in its .early years, CCNNE often obtained new customers through brokers, who were then entitled to commissions. As a method of managing the risk of default, CCNNE would withhold part of the brokers’ commissions in what it referred to as a “special hold-back account.” If a customer failed to pay, CCNNE would take funds from that account to pay itself the amounts due.[12] One consequence of this practice was to reduce CCNNE’s need for writing off receivables as uncollectible, since it would collect missed payments from the special hold-back account. As a result, its charge-off rate, as reflected in financial statements, would understate the actual amount of its customers’ delinquencies. In 1999 and 2000, the understatement was enough to make the difference between compliance and non-compliance with the limit on charge-offs under CCNNE’s credit agreement with the bank. In later years, CCNNE obtained fewer new customers through brokers, and the special hold-back account became exhausted in 2000. Thereafter, CCNNE’s methods of addressing customers’ inability to pay were PIK notes and rewriting of loans, as described supra.
When CCNNE rewrote a loan or accepted payment in the form of a PIK note, it would document the transaction in a disbursement memorandum, which would set out how the proceeds of any new loan were to be disbursed on behalf of CCNNE’s customer. For example, a disbursement memorandum might recite an amount to be paid to a seller for a new piece of *516 equipment, an amount to be paid to CCNNE as repayment of the principal balance of one or more outstanding loans, an amount to be paid to CCNNE for outstanding interest on loans being repaid, and an amount to be paid to CCNNE for fees in connection with the transaction. CCNNE would retain the disbursement memorandum in its loan file for the customer.
With respect to amounts being disbursed from these transactions to CCNNE, CCNNE would issue a check to itself from its operating checking account, and then deposit the check into the same account, placing a copy of the check with the disbursement letter in the customer’s credit file. One consequence of this practice was that, although the balance in CCNNE’s bank account would not change, an accounting of amounts coming into and going out of the account would appear to show a larger volume of receipts and disbursements than was actually occurring. Similarly, financial statements that treated those checks as cash received would overstate the amount actually received.[13] Between 1996 and 2005, CCNNE wrote checks to itself totaling more than $13 million. The number and volume of such checks increased in each year between 1999 and 2004. In FY 1999, CCNNE wrote 11 checks to itself, for a total of $509,486. In FY 2000, it wrote 17 such checks, for a total of $931,643. In FY 2001, it wrote 33 such checks, for a total of $966,687. In FY 2002, it wrote 45 such checks, for a total of $2,084,410. In FY 2003, it wrote 60 such checks, for a total of $2,398,360. In FY 2004, it wrote 132 such checks, for a total of $3,289,063. In FY 2003 and 2004 the amounts CCNNE paid to itself on behalf of customers exceeded the other payments CCNNE received from customers.
In addition to rewriting and the use of PIK notes, CCNNE also, on occasion, held back certain amounts from new loans to existing customers, so as to have those funds available to offset future receivables from that customer that the customer could note otherwise pay. CCNNE would classify those amounts as “unap-plied cash.” In substance, such amounts functioned as reserves against anticipated defaults by those customers.
CCNNE did not point out these various practices either to the bank or to BDO, but it did not hide them. As indicated supra, its loan files included disbursement letters for each transaction, along with copies of the checks written to itself, and its checking account records also reflected the checks written to itself. As will be discussed further infra, both the bank and BDO had full access to all of CCNNE’s files and records, and reports CCNNE submitted to the bank on a regular basis provided information that, on close examination, would have alerted the bank to these practices. In addition, CCNNE maintained its operating checking account at the bank, making all deposits into and drawing all checks from that account. The bank drew CCNNE’s payments to it from that account, transferred loan proceeds into it, and had full access to all information about transactions in that account.
2. The Loan.
Unlike CCNNE, the bank, as might be expected, had very formal standards and processes. With respect to CCNNE, however, it did not always follow its own policies. Its departures resulted from at least four factors: the high regard in which its senior executives held the Seder brothers; evaluation and compensation systems for bank personnel that weighted incentives toward increased lending, rather than prudent evaluation of risks; internal distractions and failures of communication arising from the various bank merger transitions; and inadequacies in internal systems, resulting in failures to analyze and respond to information received.[14] The bank, much like CCNNE with respect to its borrowers, made its profits from CCNNE’s payments of interest and various fees.[15] Like CCNNE, it focused its attention accordingly.
CCNNE’s borrowing relationship with the bank began in 1992 with a secured revolving loan in the amount of $2 million, for a two-year term, issued by what was then Bank of Boston. Richard Remis, then a loan officer with Bank of Boston and now an Executive Vice President of the bank, approved the loan based on a report, prepared by a credit officer, that emphasized the Seders’ background and experience. The terms of the loan were set forth in a credit agreement (trial exhibit 7), which Larry Seder signed for CCNNE. CCNNE’s parent entities, Redes and Cobblestone, both provided guarantees, which Jim Seder signed for the guarantors. The credit agreement required CCNNE to execute a security agreement and an assignment of contracts, and CCNNE did so.
The loan functioned as a line of credit; CCNNE could borrow as it chose, up to the stated maximum amount, provided that its financial condition met certain requirements. It was required to pay only interest, not principal, during the period of the loan; it would be required to pay the principal in full at the end of the two-year term, unless the bank agreed to extend the term. During the loan term, the bank was entitled to full access to all books and records of CCNNE, and CCNNE was required to submit various reports and certifications, as specified in the credit agreement. Among the reports was an annual audited consolidated financial statement of CCNNE’s ultimate parent, Redes. No audited financial statement of CCNNE itself, or its immediate parent, Cobblestone, was required under the 1992 credit agreement.
Between 1992 and 1995, the bank and CCNNE executed a series of amendments to the credit agreement, each raising the maximum amount of the loan and extending its term. On September 29, 1995, the bank and CCNNE executed a new credit agreement (trial exhibit 18) providing for a maximum loan amount of $12 million, again guaranteed by Redes and *517 Cobblestone. Again Larry Seder signed the credit agreement on behalf of CCNNE. Again the credit agreement required CCNNE to execute a security agreement and an assignment of contracts. Apparently — although the record is less than clear on this point— CCNNE did not execute those documents in connection with the 1995 security agreement.[16]
Under the 1995 agreement, unlike its predecessor, the loan would no longer terminate abruptly after a fixed period, with full payment due immediately. Rather, if the bank decided not to renew or extend the loan after its termination date, it would convert to a term loan amortized over 18 months, so that CCNNE would have to pay off the full principal balance, with interest, over that time. A 1999 amendment extended that period to 24 months.
The 1995 credit agreement, like its predecessor, gave the bank full access to all books and records of CCNNE, and also required CCNNE to submit regular reports. The reports required included: an annual audited consolidated financial statement of Redes (but not of CCNNE itself or Cobblestone) within 120 days after the September 30 end of its fiscal year; along with CCNNE’s own “reviewed” but unaudited annual financial statement; CCNNE’s own unaudited quarterly financial statements, certified by its “principal financial officer”; and a monthly “Borrowing Base Report” and “Contract Aging Report.”[17] Along with each report submitted, CCNNE was required to provide a certification by its chief financial officer that the report was accurate, that it was prepared in accordance with GAAP, and that no event of default had occurred.
CCNNE did provide the specified reports. One or both of the Seder brothers hand-delivered the audited annual financial statements to bank personnel each year. Robin Seder Isenberg prepared the annual and quarterly unaudited financial statements for CCNNE, and the other reports, and either she or one of the brothers would deliver or transmit them. Larry and Jim both received, or had access to, all of the reports Isenberg provided to the bank. Isenberg used the annual audited financial statements as a template for her reports. Although she had only minimal familiarity with GAAP, she certified that each of the reports complied with it; her basis for that conclusion, as she testified, was that no one told her otherwise. The bank would regularly enter data from both audited and unaudited financial statements into what it referred to as its “spreading” system, which it would use to generate internal spreadsheets presenting financial information for a period of years. The bank would refer to those internal reports in connection with periodic evaluations of the account, including evaluations related to requests for increases in the loan amount or other changes in the loan.
In addition to reporting requirements, the credit agreement imposed financial requirements; CCNNE’s failure to meet any such requirement would constitute an event of default. These requirements included that neither CCNNE nor either of its parent entities would incur a net loss in any quarter; that CCNNE would maintain specified ratios of debt to net worth and cash flow to interest expense; and that it would not incur charge-offs for any four-quarter period exceeding two percent of receivables.[18] The certifications regularly provided by Robin Isenberg represented that no default had occurred on these or the other requirements of the credit agreement, and set forth calculations indicating compliance. As will be discussed further infra, these representations were on some occasions inconsistent with some of the information that appeared on the face of the reports.[19] In certain other respects, although the representations were consistent with the numbers that appeared on the reports, they were inconsistent with the underlying reality, as a result of the techniques described supra that CCNNE used to address its customers’ inability to pay.
Within the maximum loan amount as it stood at any particular time, the credit agreement limited the amount CCNNE could borrow to a specified percentage of the “Borrowing Base,” defined as the “Net Present Value of Eligible Contract Receivables.” Contracts were ineligible for inclusion in the borrowing base if they were in default, if payments were more than 60 days past due, if the customer was insolvent or in bankruptcy, or if the customer was located outside the United States. After August of 1999, as a result of an amendment executed at that time, contracts were also ineligible if they had been rewritten because of delinquency or other credit problems, although such contracts would become eligible again after two consecutive quarters with no default.[20]
The “Borrowing Base Reports” that Robin Isenberg submitted to the bank each month set forth calculations showing permissible borrowing based on contracts represented to be eligible. Isenberg determined eligibility, for purposes of the calculations set forth on the borrowing base reports, based on information in the “Aged Lease Receivable Report” that she attached to each borrowing base report. That document indicated for each contract the number of days payment had been due, in categories (that is, 1-30 days, 31-60 days, 61-90 days, 91-120 days, over 120 days). When CCNNE had brought a customer current by making a payment to itself on a customer’s behalf, either in return for a PIK note or through rewriting of a contract, it would then classify the account as current, and Isenberg would treat it as eligible for inclusion in the borrowing base. She continued to do so, even after the 1999 amendment, with respect to accounts that had become current through rewriting. As a result, *518 the borrowing base would regularly appear to be higher, and CCNNE would be permitted to borrow more than would have been the case if the reports had excluded those accounts.
The aged lease receivables report listed customers by name, in alphabetical order; set out by number all loans and leases for each customer; and indicated for each loan or lease the date of the next payment due and the term of the contract.[21] Thus, as will be discussed further infra, careful examination of a series of such reports would have permitted a reviewer to trace the sequence of events with respect to each customer and account, and to perceive patterns indicative of rewriting. As will be discussed further infra, the bank did not conduct that sort of analysis.
Between 1995 and August of 2003, the bank and CCNNE amended the 1995 credit agreement seven times, each time increasing the maximum amount of the loan and extending its term. Ultimately, the maximum loan amount reached $20.5 million. Some of the amendments made other changes as well, including changes in the various ratios and percentages specified for the financial covenants.
The 1995 agreement (like its predecessor), required that CCNNE deliver to the bank, for the bank to keep in its physical possession, all original leases and loan contracts between CCNNE and its customers, and further required that such contracts not be modified, transferred, or discharged without the bank’s written consent. Any contract not in the bank’s physical possession was to be excluded from the borrowing base. The purpose of these requirements was to enable the bank to monitor its collateral, and to protect the bank against potential conduct of CCNNE that could impair the collateral, such as pledging or selling contracts to another creditor, rewriting them, modifying them, or discharging them without payment or without obtaining adequate consideration that would provide substitute collateral for the bank.
CCNNE never complied with these requirements, and the bank never enforced them. As will be discussed further infra, in mid-1999 the bank and CCNNE reached agreement on a substitute technique that the bank determined would serve some of the purposes of the original requirements: CCNNE would place a stamped notation on each original contract or lease, indicating that it was pledged to the bank. CCNNE did not begin to do so, however, until 2005. CCNNE attributes the delay to the bank, in that CCNNE was waiting for the bank to specify the language for the notation, which it did not do until then. Between 1999 and 2005, the bank never checked to determine whether CCNNE was stamping the contracts.
The 1995 agreement also required that CCNNE submit to the bank a form “Notice of Borrowing” each time it sought to draw on the loan. The form included a renewal of all representations and warranties in the credit agreement, and a certification that no default had occurred or would result from the requested loan advance. The bank has no such documents, and no evidence to indicate that it ever received any from CCNNE. The Court infers that CCNNE did not submit those documents, but communicated its requests for advances by other means, to which the bank responded by transferring the requested amounts into CCNNE’s account at the bank. As indicated supra, the bank did receive regular certifications of compliance with all covenants, and the absence of defaults, in various other forms. As will be discussed further infra, it appears that such transfers were essentially automatic, as long as the amount was within the limit of availability based on the calculations shown in the borrowing base reports. The evidence does not indicate that the bank engaged in any sort of evaluation and approval process in response to CCNNE’s routine requests for advances within the loan availability.
Over the course of the relationship between the bank and CCNNE, the bank assigned a series of loan officers, relationship managers, and other personnel at various levels to the account. Those personnel would communicate with CCNNE regularly, sometimes in person, and would also, with assistance of various supporting staff members, review and examine the reports received from CCNNE with varying levels of intensity. The bank also, from time to time, conducted field examinations of CCNNE’s records, of varying scope, either through its own personnel or through outside vendors.[22] Under the credit agreement, CCNNE bore all costs of field examinations. The scope of such examinations was entirely up to the bank.
Theoretically, if any information obtained through any of these reviews, or from any other source, at any time, identified an event of default, the bank could have declared the loan in default, stopped all advances, accelerated the loan, and demanded immediate full payment, failing which it could have seized all of CCNNE’s assets, as well as enforced the guarantees against Cobblestone and Redes. In practice, the bank repeatedly overlooked information indicating that events of default had occurred. The bank also repeatedly overlooked information from which it could have drawn inferences that would have called into question both the specific information reflected in financial statements and the general assurances provided by the Seders (particularly Larry) in conversations with bank officials.
3. The Information the Bank Received, and Its Decisions. 
4. The BDO Audits. 
*519 5. The litigation.
The bank brought this action on April 21, 2006, naming as defendants BDO, CCNNE, Cobblestone, Redes, and the Seders individually. The claims that remain after dispositive motions are negligent misrepresentation against BDO and the Seders (counts I and II), violation of G.L.c. 93A against the Seders (count IV), and breach of contract against CCNNE, Redes, and Cobblestone (counts v. and VI).[70] BDO has asserted certain affirmative defenses, four of which it now presses: comparative negligence, contributory negligence, assumption of risk, and the statute of limitations.[71] As noted supra, default has entered against the three corporate defendants, establishing their liability for breach of contract. The Court will address each claim in turn, and will address the affirmative defenses as needed.
II. CONCLUSIONS OF LAW, FINDINGS OF ULTIMATE FACTS, AND DISCUSSION
1. Count I: Negligent Misrepresentation Against BDO.
The elements of the bank’s claim of negligence misrepresentation against BDO are those set forth in the Restatement (Second) of Torts, §552. See Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 496 (1998). The Restatement provides, in pertinent part:
(1) One who, in the course of his business, profession or employment. . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2)... the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
Thus, to prove its claim against BDO, the bank must prove (1) that BDO supplied false information for the guidance of others; (2) that BDO failed to exercise reasonable care or competence in obtaining or communicating that information; (3) that BDO intended to supply the information for the benefit and guidance of the bank or knew that CCNNE (and/or Redes or Cobblestone) intended to do so; (4) that the bank reasonably relied on the false information in a transaction; (5) that the transaction was one, or was substantially similar to one, that BDO intended the information to influence or knew that CCNNE (and/or Redes or Cobblestone) intended it to influence[72] and (6) that the bank’s justifiable reliance caused its loss.
The first element is the supplying of false information. For information to be false (or true) it must be “fact, not. . . expectation, estimate, opinion, or judgment ... A fact is something susceptible of knowledge. Zimmerman v. Kent, 31 Mass.App.Ct. 72, 79 (1991) (internal quotations and citations omitted). Nevertheless, a statement about a future event can be a misrepresentation in a situation ’’where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate." Id. (internal quotations and citations omitted).
The statements BDO made, on which its claimed liability is based, were that it had audited Redes’s consolidated statements for FY 1999-2005, and CCNNE’s annual statements for FY 2003 and 2004, in accordance with GAAS; that in its opinion each statement presented the financial position of the identified entity fairly in conformity with GAAP; and, as to the consolidating statements, that the information supplied in them had been “subjected to the auditing procedures” applied in the audit of the consolidated statements, and in BDO’s opinion, “is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole.” The claimed falsehood is not that BDO did not audit the information presented in the statements; there is no question that it did. The claim is that, contrary to its representation, it did not do so in compliance with GAAS, and that, contrary to its expressed opinion, the statements did not present the information fairly in compliance with GAAP.
BDO contends that these statements are, by their nature, opinion rather than fact, and therefore cannot constitute the supplying of false information. Both GAAS and GAAP, the argument goes, are sets of aspirational norms, application of which depends on the exercise of judgment. See Bily v. Arthur Young & Co., 3 Cal.4th at 382, 400. That is particularly so, BDO points out, with respect to the determination of reserves, which depends on assessment of the probability of future events.[73] See id. at 400.
The bank responds, in substance, that BDO’s position on this point would effectively immunize auditors from all liability to non-clients for negligent audit opinions, despite the many authorities that recognize the possibility of such liability under the rubric of negligent misrepresentation. See Nycal, supra, and cases cited; Reisman, 57 Mass.App.Ct. at 123-24; Bily, supra at 407; Restatement §522, comments b, e, j; see also Restatement (Second) of Torts §539 (1977), comment b. As the California Supreme Court expressed the point in Bily:
Under certain circumstances, expressions of professional opinion are treated as expressions of fact. When a statement, although in the form of an opinion, is not a casual expression of belief, but a *520 deliberate affirmation of the matters stated, it may be regarded as a positive assertion of fact. Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant’s representation may be treated as one of material fact.
3 Cal.4th at 408 (internal quotations and citations omitted).
This Court recognizes the conceptual (and linguistic) difficulty in characterizing BDO’s audit opinions as statements of fact. In light of the authorities cited, however, the Court concludes that they were, for purposes of the bank’s claim of negligent representation. As BDO stresses, and as will be discussed further infra with respect to the element of justifiable reliance, the bank was certainly a sophisticated reader of financial statements. Still, BDO held itself out as, and the bank could fairly have viewed it as, having a level of expertise with respect to both GAAS and GAAP that the bank could not be expected to have. In this context, the bank could fairly interpret BDO’s audit reports as representing that BDO had exercised due care in the performance of its audits, in accord with applicable professional norms; that it had gathered and evaluated sufficient information to provide a basis for the exercise of reasonable professional judgment; that it had exercised such judgment; and that, to the extent that its opinions necessarily involved elements of estimation and prediction, the estimations and predictions it had made fell within the range of reasonable professional judgment. As indicated supra, the Court has found that that was not the case. The Court therefore finds and concludes that BDO provided false information in its audit reports for each of the audited financial statements.[74] On the same basis, the Court finds and concludes that BDO failed to exercise reasonable care or competence in obtaining and communicating that information, in that it failed to conduct its audits in compliance with GAAS. The bank has thus met its burden of proof as to the first two elements set forth supra.
The third element, that BDO intended to supply the information for the benefit and guidance of the bank or knew that CCNNE (and/or Redes or Cobblestone) intended to do so, is established in the evidence beyond room for serious dispute. BDO was fully aware of the existence and terms of the loan, including the requirement that CCNNE supply audited financial statements to the bank; indeed, BDO knew that the primary if not sole purpose of its audits was to satisfy that requirement. It also knew that CCNNE did in fact supply the audited financial statements to the bank each year. Whether and to what extent BDO knew exactly how the bank would use the audited financial statements, and in reference to what particular decisions, is a more difficult question that relates to the fifth element, which, for the reasons that will appear, the Court will not reach. As to the third element, the Court finds and concludes the bank has met its burden.
The fourth element, that the bank reasonably relied on the false information in a transaction, incorporates two closely related factual issues: whether the bank did in fact rely, and whether such reliance was reasonable. See Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 615 (5th Cir. 1996) (applying Restatement §552). Reasonableness of reliance depends on the totality of the circumstances. Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 467-68 (2003) (reliance unreasonable when defendant’s oral statement contradicted written agreement); O’Connor v. Merrimack Mut. Fire Ins. Co., 73 Mass.App.Ct. 205, 214-16 (2008); Collins v. Huculak, 57 Mass.App.Ct. 387, 391-94 (2003). Relevant circumstances include the plaintiffs level of sophistication. See O’Connor, 73 Mass.App.Ct. at 215-16 (reliance was not justified where the plaintiff “was far from a neophyte in real estate matters”). A plaintiffs failure to perform reasonable investigation, when it has the opportunity to do so, undermines its claim of reasonableness. See Collins, 57 Mass.App.Ct. at 392 (“[t]he person claiming justifiable reliance is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination or investigation”) (citations omitted); see also Trifiro v. New York Life Ins. Co., 845 F.2d 30, 34 (1st Cir. 1988) (applying Massachusetts law). A plaintiff cannot showjustifiable reliance when it “had the ability and the right to investigate and thus could have performed its own investigation.” Banco Urquijo, S.A. v. Signet Bank/Maryland, 861 F.Sup. 1220, 1248-49 (M.D.Pa. 1994) (citation omitted).
Here, the bank was highly sophisticated, particularly with respect to a customer that was in the same business it was in. Its credit agreement gave it the right to conduct whatever investigation it chose, at any time, at CCNNE’s expense. The Court considers those facts in evaluating the reasonableness of its conduct.
The findings set forth supra show that the bank relied on the audited financial statements at least in a general sense. That is, each year it entered certain figures drawn from audited consolidated statements, particularly figures for Redes’s total sales, operating profit, net income, and tangible net worth, into its spreading system, and included those figures in various memoranda and reports that its loan officers and others generated over the course of the relationship. It is also apparent that the various bank officials involved generally took comfort from receiving financial statements that included unqualified audit opinions. It does not necessarily follow that the bank relied *521 on the audited statements in connection with any particular transaction, or, if it did, that such reliance was reasonable in the circumstances. That determination requires examination of the particular transactions that occurred during the period in issue, in relation to the bank’s receipt of each financial statement.
The first financial statement that the bank contends was erroneous was the one for FY 1999, which the bank received on January 19, 2000. As of that date, the bank had approved, and the parties had signed, amendment 4 to the 1995 credit agreement, which raised the maximum amount of the loan to $ 16 million. Clearly, the bank did not rely on any false information received from BDO in deciding to approve a line of credit for CCNNE of $16 million. No further increase or other amendment occurred for the next two and half years, until June of2002. When the bank received the audited statements for FY 2000 and FY 2001, in late January of 2001 and 2002, respectively, no request for increase or other action was pending or imminent. The next increase, to $18 million, occurred in late 2002, after completion of FY 2002, but before the bank had received the audited statement for that year. Thus, none of the audited financial statements through FY2002 became a particular focus of the bank’s attention in making a decision to increase the loan amount or otherwise amend the credit agreement.
The bank nevertheless contends that it relied on the FY 1999 statement, and each one thereafter, on a continuous basis, in deciding to continue making advances under the credit agreement, and not to exercise the various rights available to it for default by CCNNE. Put differently, the bank suggests that, had the FY 1999 statement, and each subsequent one, provided full and accurate information, the bank would have immediately stopped lending to CCNNE, accelerated the loan, and done everything available to it to collect the outstanding amount and otherwise protect its interests. The Court is not persuaded.
The bank knew, from the very beginning of the relationship, that CCNNE’s business consisted of making loans to borrowers who would not qualify for loans directly from the bank. Thus, in effect, the bank was relying on CCNNE’s principals — the Seder brothers — to do the underwriting, monitoring, and collection activity that the bank was unwilling to do with respect to such customers. The bank knew, or reasonably should have known, from the very beginning, that its position with respect to its loan was only as good as the work being done by the Seder brothers to manage CCNNE’s loans.
The bank also knew, throughout the relationship, that it had no personal guarantees from any individuals; that the guarantees from Redes and Cobblestone had value only to the extent that those entities had value; and that Cobblestone showed consistent net losses and negative net worth beginning in 1997. Those losses were an event of default that gave the bank grounds to cease lending and accelerate the loan, but it did not do so. The bank also knew that its security consisted of CCNNE’s receivables, the security for which in turn depended on the value of the underlying collateral. As to that collateral, the bank knew that it had no appraisals, no UCC filings, and no documentation or direct information. Again, its position depended on the diligence and judgment of the Seder brothers.
Thorough and competent audits of Redes’s financial statements, beginning with FY 1999, would have provided information that should have led the bank to question its reliance on the Seder brothers. But the bank’s policy was not to rely solely, or even primarily, on audited financial statements. Rather, its policy was to employ a list of additional safeguards, including possession of original contract documents; field examinations conducted at least annually; and receipt of monthly and quarterly reports that, if examined closely, would have alerted the bank to the practices that undermined the value of the bank’s security . As the facts set forth supra indicate, the bank repeatedly and consistently departed from its own policies with respect to CCNNE; it did not obtain original contract documents; it waited long periods between field examinations, which it (or its vendors) conducted cursorily at best; it downplayed the negative findings that did emerge from those examinations; and it failed to conduct the careful examination of borrowing base reports and accompanying aged lease receivables reports that would have enabled it to perceive the significance of the information those reports provided. Those departures deprived the bank of information that it reasonably should have had, and led it to overlook information it did have.
Despite its departures from its own policies, the bank actually did receive, and did consider, information about the practices that it now contends BDO should have noticed and reported. As early as 1997, the bank’s field examination pointed out customers in bankruptcy; inadequate reserves by some $525,000; a high rate of delinquencies; rewriting of a customer’s contracts for credit reasons; and the absence of documentation regarding collateral. The bank, as far as the record discloses, took no action to address those issues at that time, and the loan officer (Mozzone) did not even review the report of that examination when she considered an increase in the loan amount in 1999. The loan officer did consider the 1999 field examination report, which raised some of the same concerns, and which also pointed out the large inter-company loan that the bank focused on some four years later. But the action the bank took to address those concerns was utterly ineffectual. Meanwhile, the bank relied on information that was repeated in a series of bank memoranda, but was either erroneous (the list of purported high-profile customers) or drawn solely from assurances given by Larry Seder (strong collateral value).
Through the next several years, information the bank did receive continued to show grounds for con *522 cern, which the bank did not address in any effective way. Borrowing base reports in 2000 and 2001 showed high delinquencies, and increasing concentration. The pattern of increasing concentration continued through 2002, while delinquencies decreased, without explanation or inquiiy by the bank. The Toñas field examination report in June of 2001 alerted the bank to rewritten contracts that had been included in the borrowing base, increasing concentration, and customers in bankruptcy. That information in itself should have led the bank to question the amounts shown in the financial statements as reserves. Tofias’s November 2002 report showed yet further concentration, with delinquencies down; Toñas, like the bank, apparently did not make sufficient inquiiy to discover the relationship between reduced delinquencies through rewritten contracts, and increasing concentration. Meanwhile, the audited financial statements for 2000, 2001, and 2002, despite their flaws, showed increasing percentages of receivables that would not be collected until after five years, and increasing net losses for Cobblestone. The audited statement for FY 2002 explicitly pointed out high concentration and the resulting risk to CCNNE’s financial condition. The bank, it appears, gave no attention to that information.
Overall, what this pattern reveals is that through the end of 2002 and into early 2003, the bank was paying little attention to the information it received, even when that information cried out for attention. The bank’s conduct with respect to the CCNNE loan during this period was not reasonable. Nor is it credible to believe, in the face of this pattern, that more accurate reports from BDO would have gotten the bank’s attention and triggered action.
In early 2003, the bank’s loan officer (Grondin) did begin to take notice. But the information that caught his attention — the inter-company loam-had been known to the bank since 1999. Why the bank had not previously appreciated the significance of the loan for CCNNE’s receivables, reserves, and leverage, and for the value of the Cobblestone guarantee, is unclear. What is apparent is that, even when it did perceive these issues, it did not take the actions it now suggests it would have if fully informed. Instead, the bank approved an increase to $19.5 million, along with a loosening of the leverage covenant to avoid violation, and then a second increase later in 2003 to $20.5 million. The loan officers (Grondin, Houllahan) recommended those steps despite the almost entirely adverse results of their efforts to investigate CCNNE’s largest customers.
By the fall of 2003 — before the bank had received the audited consolidated report for Redes for FY 2003, and before it had ever received any audited report for CCNNE alone, the loan had reached its maximum level of $20.5 million. At that point, all decisions to increase the loan amount were in the past, and no longer subject to influence from audited financial statements or any other source. That does not mean the bank had no decisions to make; had it concluded at any time that CCNNE was in default, it could have exercised its rights. But the events that followed hardly demonstrate that it would have done so with any vigor or expedition, no matter what information it received.
What ultimately led the bank to focus on the CCNNE loan in the fall of 2003 was not any of the information it received through reports or field examinations; it was the OCC investigation, which pointed out grounds at least for serious concern, if not immediate action. The bank’s response was not to heed the warning, but to “defend” its loan to the OCC. At about the same time, a field examination report from Toñas indicated still higher concentration, and increased tenor, along with the erroneous information that CCNNE “holds all titles.” The bank still took no action, either in reliance on that error by Toñas, or simply in continuation of its previous pattern.
By early 2004, when the bank received the audited reports for FY 2003, it had eveiy reason to believe that the CCNNE loan posed severe risk, and to take whatever action it could to mitigate the risk. The audited reports (this time for both Redes and CCNNE), despite their flaws, provided additional information: they pointed out extreme concentration, and more than 25% of accounts receivable not due until after five years. The bank also knew that it had grounds for action; at least one event of default — Cobblestone’s net losses — had occurred continuously since 1997. But it did not act. Instead, its loan officer (Houllahan), in his memorandum of February 10, 2004, described a plan to restructure the loan when it expired more than a year later. That memorandum belies the bank’s present contention that it relied on understated reserves in adopting that plan; the memorandum acknowledged that the bank itself viewed CCNNE’s reserves as insufficient, despite what Houllahan understood to be the auditor’s confirmation.
Later that year, after unaudited quarterly reports showed increasing delinquencies, the bank transferred the loan to the special assets group. But in November, when CCNNE could not make its monthly interest payment, the bank did not take the opportunity to declare it in default; rather, it provided an extension. It obtained another field examination report in December, this time from Hollis Meddings, but the resulting findings of extreme concentration (nine largest accounts were 91%), long tenors, and checks from CCNNE to itself, still triggered no immediate action. By January of 2005, when the bank received the last audited reports, the bank had come to recognize its need to extricate itself from the CCNNE loan, and to preserve whatever value it could. It acted on that understanding at a glacial pace, but nothing in the evidence would support a finding that any different or more accurate information in the audited reports would have led it to act differently.
Overall, the Court finds and concludes, the bank did not reasonably rely in any transaction on false information provided by BDO. The bank has therefore *523 failed to prove the fourth element of its claim against BDO, along with the remaining elements, and BDO is entitled to judgment.
This conclusion obviates the necessity for consideration of BDO’s affirmative defenses. The Court nevertheless notes, for the sake of completeness, that were it to consider those defenses, it would rule that the claim of negligent misrepresentation is not time-barred, since the bank’s cause of action accrued no earlier than when it first suffered injury, which was when CCNNE defaulted on April 1, 2005. The bank sued within three years of that date. The Court would rule further that comparative negligence applies as a matter of common law, see Clark v. Rowe, 428 Mass. 339, 345 (1998), and supersedes both the doctrine of assumption of risk and the audit interference doctrine, which was developed to ease the harshness of common-law contributory negligence. See Scioto Memorial Hospital Ass’n v. Price Waterhouse, 74 Ohio St.3d 474 (1996); Halla Nursery, Inc. v. Baumann-Furrie & Co., 454 N.W.2d 905 (Minn. 1990); Board of Trustees of Cmty. Coll. Dist No. 508, County of Cook v. Coopers & Lybrand, 281 Ill.2d 259, 282-90 (2003) (Gar-man, J., dissenting). The Court would find, as a matter of fact, that the bank was negligent, that its own negligent was a proximate cause of its harm, and that its negligence exceeded that of BDO.
2. Count II: Negligent Misrepresentation Against the Seders.
The elements of the bank’s negligent misrepresentation claim against the Seders are the same as those already outlined as to BDO. The primary difference in the claims is the alleged false information, and the facts relating to the bank’s claimed reliance. These issues must be considered separately with respect to each of these three individual defendants.
Larry Seder, as discussed supra, was the primary decision-maker at CCNNE; he set its strategy, policies, and practices. He also took the primary role in CCNNE’s dealings with the bank. In the course of those dealings, he made multiple and repeated representations to the bank, both oral and written. Among his written representations were certifications, signed in connection with each amendment to the credit agreement, that CCNNE was in compliance with all covenants, and no event of default had occurred. Based on the facts found supra, those representations were false, beginning at least with the certifications signed in 1999. In fact, multiple covenant violations and events of default had occurred, including charge-offs (if calculated to reflect charges to the special hold-back account) exceeding 2%; Cobblestone’s net losses; excessive leverage when calculated based on treating on the inter-company receivable as uncollectable; and inclusion of rewritten contracts in the borrowing base. Larry Seder did not sign financial statements, but he did deliver many of them, thereby implicitly representing that they were accurately presented in accordance with GAAP, which they were not. Larry Seder also, perhaps most importantly, gave repeated oral assurances to bank personnel that CCNNE followed strict underwriting practices, that it carefully monitored its collateral, and that the value of the collateral was sufficient to cover its loans. These representations were false.
They were also, at the very least, negligent, if not intentional. Larry Seder had insufficient familiarity with GAAP to determine whether financial statements complied with it, and he knew that he lacked such familiarity. He knew, however, that he was rewriting loans for credit reasons, and representing the new loans as current and eligible for the borrowing base. He was thoroughly familiar with his own underwriting and lending practices, including the practices described supra that inevitably and necessarily resulted in loans far exceeding any reasonable value of the collateral. He knew that those practices, and the value of the collateral, did not fit the descriptions and assurances that he gave the bank, and that the deviation grew as time went on. The bank relied heavily on Larry Seder’s representations, particularly those regarding CCNNE’s underwriting practices and the value of its collateral. Indeed, Larry Seder’s credibility with senior bank executives was a key factor in its decision-making throughout the relationship. And his execution of certifications in connection with each amendment was a prerequisite to each; the bank would not have executed the amendments without them.
Robin Isenberg had far less authority than her father, and less significance in the minds of the bank’s decision-makers. However, her role as chief financial officer put her in the position of signing and transmitting multiple documents containing representations, including monthly borrowing base reports, certifications of covenant compliance, and quarterly and annual financial statements. The borrowing base reports, although they disclosed much accurate information, were false insofar as they represented rewritten accounts as new, current, and eligible, and insofar as they overstated collections and new receivables. The quarterly and annual financial statements were false insofar as they were not presented in accordance with GAAP, for all the reasons discussed supra The certifications of compliance were also false for reasons already discussed. The evidence provides no reason to believe that Isenbeig actually knew of any falsehood. But she did know that she lacked sufficient basis to make the judgments that she purported to make. In that sense, her misrepresentations were negligent. The bank relied on Isenberg’s reports, particularly the borrowing base reports, which directly triggered the loan advances. As discussed supra, from all that appears in the evidence, loan advances were automatic, up to the ceiling set by the calculations appearing in those reports.
Jim Seder, as far as the evidence discloses, did not sign certifications or financial statements, and made no oral representations. He did deliver some of the financial statements, thereby implicitly adopting them as his own representations. But the evidence does not provide a basis to determine which ones he delivered. Without that information, the Court cannot find that *524 the bank relied on any particular representation that he adopted, with respect to any particular transaction. The Court therefore finds and concludes that the bank has proved negligent misrepresentation by Larry Seder and Robin Isenberg, but not by Jim Seder.
The flaw in the bank’s claim of negligent misrepresentation against Larry Seder and Robin Isenberg is the same as in its claim against BDO; it has failed to show that its reliance was reasonable in the circumstances. As discussed supra, the bank had an absolute right, at all times, to examine all of CCNNE’s books and records as thoroughly as it might choose, at CCNNE’s expense. Had it exercised that right with more diligence, at any time earlier than the Atwell report in 2005, it would easily have found the checks CCNNE wrote to itself, along with records of the special hold-back account and of unapplied cash, both used as substitutes for reserves and charge-offs. It would also have discovered the absence from CCNNE’s files of any evidence of systematic underwriting procedures and documentation of collateral value. Perhaps more to the point, if it had enforced the requirement under the credit agreement that it hold the originals of all contracts, and consent to any modification or discharge, it would have prevented the rewriting practices, which were funded through ever increasing borrowing from the bank, and which led to CCNNE’s ultimate downfall and the bank’s loss. Even if the bank had done none of those things, but had performed closer analysis of the information it actually received in the borrowing base reports, attached aged lease receivable reports, and financial statements, and from its own field examiners over the years, it could have detected the pattern and stopped it. Rather than do any of those things, the bank relied on its general esteem for the Seder brothers, along with the favorable numbers that appeared on superficial reading of the reports. The Court finds and concludes that the bank’s reliance on the misrepresentations was unreasonable in the circumstances. The Court concludes, therefore, that the bank cannot recover from any of the three individual defendants for negligent misrepresentation.
3. The G.L.c. 93A Claim against the Seders (Count IV).
The bank’s c. 93A claim against the Seders rests on the same conduct alleged in the negligent misrepresentation claim; the bank alleges that the Seders engaged in unfair and deceptive conduct in making those misrepresentations, and that such conduct caused it harm. For the reasons already discussed, the Court finds and concludes that Lariy Seder made misrepresentations that were at least negligent, if not intentional. That conduct, the Court finds and concludes, was unfair and deceptive. Robin Isenberg’s conduct, in the Court’s view, although negligent, did not rise to the level of unfair or deceptive, because she acted entirely under the direction of others she had reason to trust, without any intent to deceive, and without comprehension of the potential consequences of her actions.
To recover against Larry Seder under G.L.c. 93A, §11, the bank must prove a causal connection between the deception and the loss, and that the loss was foreseeable as a result of the deception. International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 850 (1983), citing Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 800-01 (1976). There is no question here that the bank lost money, and it is apparent that Larry Seder’s deceptive conduct contributed in some degree to the bank’s loss. As already discussed, however, in the Court’s view, the bank’s own conduct was the principal cause of its loss. As Larry Seder correctly perceived, the bank wanted to lend, and was willing to go to great lengths to do so, even as evidence mounted of the likely outcome. On the evidence presented, there is every reason to believe that, had Larry Seder fully and forcefully informed the bank of all of the practices it now complains of — CCNNE’s idiosyncratic underwriting methods and inadequate security, the special hold-back account and unapplied cash, the rewriting of contracts, the checks to itself — the bank would still have made the loan at the outset, and it would have continued lending, and providing increases, for at least a substantial portion of the time involved.[75]
In these circumstances, the Court cannot conclude that the bank’s entire loss, of $20.5 million, was a foreseeable consequence of Larry Seder’s deceptive conduct. The effort to apportion the loss, so as to determine damages, requires consideration of hypothetical questions about what the bank would have done with what information when. That exercise necessarily involves a high degree of uncertainty, nearly verging on speculation.[76] The Court keeps in mind that the bank has the burden to prove the damages that flowed from Seder’s conduct, as distinguished from its own. The bank has not' proved, as it contends, that full disclosure at any particular time would have caused it immediately to cease lending, accelerate the loan and seize the collateral. Nor has it proved that, had it done so, it would have had significantly greater success than it ultimately had in selling its collateral.[77] The most the bank has proved, on the credible evidence presented, is that had Larry Seder been fully candid with the bank when he met with bank personnel in March of 2003, it would not have approved increases in the loan amount from the level of $ 18 million then in effect. It would thus have been spared the losses that resulted from subsequent increases to $20.5 million.
As discussed supra, the bank recovered a total of $921,103.91 from the sale of collateral, customer payments, and amounts seized from CCNNE’s bank account. It credited those amounts to outstanding interest and late fees, as it was entitled to do under the credit agreement. Its total contract damages thus amount to the full $20.5 principal amount of the unpaid loan. But Larry Seder was not a party to the contract, and is not responsible for the bank’s contract damages. His respon *525 sibility is for the bank’s out-of-pocket loss resulting from his conduct in violation of c. 93A. That amount, the Court finds and concludes, was the difference between $18 million and $20.5 million, minus the $921,103.91 collected — that is, $1,578,896.10.
The question of whether Larry Seder’s conduct was knowing and willful is dose. He was and is a sophisticated businessman, with long experience in commercial lending, and full understanding of its. risks. But he appears to have believed, with considerable basis, that he was doing essentially what the bank wanted him to do, and that his gamble would eventually pay off, both for CCNNE and for the bank, as a result of his own personal skills. Under these circumstances, the Court does not find that his conduct was knowing and willful, and declines to multiply the damages. The bank is entitled to judgment against Lany Seder in the amount of $1,578,896.10, with interest at the. statutory judgment rate from the date of its filing of the complaint.
4. Default Judgment Against CCNNE, Redes, and Cobblestone (Counts V, VI).
As indicated supra, these three corporate defendants have defaulted in this action. The default establishes the liability of each of them, CCNNE for breach of the loan agreement, and Redes and Cobblestone for breach of their guarantees. The bank offers evidence, which is unrefuted, and which the Court accepts and credits, that the outstanding amount due under the credit agreement, including principal, late fees, and interest at the contract rate (the bank’s prime rate plus 4%), through December 9,2011, was $36,685,990.89. The bank is entitled to judgment against these three defendants, jointly and severally, in that amount, plus interest at the contract rate until the date judgment enters. The Court expects that counsel will provide to the clerk the information necessary to calculate the remaining prejudgment interest.
CONCLUSION AND ORDER
Based on the findings and rulings set forth herein, the Court orders entry of judgment as follows:
Count I: Judgment of dismissal.
Count II: Judgment of dismissal.
Count III: Judgment of dismissal as previously ordered.
Count IV: Judgment of dismissal as to James Seder and Robin Seder Isenberg. Judgment for the bank against Lawrence Seder in the amount of $1,578,896.10, with interest at the statutory judgment rate from the date of its filing of the complaint.
Counts v. and VI: Judgment for the bank against Cobblestone Corporation of Northern New England, Redes Holding Corporation, and Cobblestone Corporation, jointly and severally, in the amount of $36,685,990.89, plus pre-judgment interest at the contract rate from December 9, 2011 until the date of entiy of judgment, and statutory post-judgment interest thereafter. The bank is entitled to judgment against these three defendants, jointly and severally, in that amount, plus interest at the contract rate until the date judgment enters.

The individual principals are brothers Lawrence (known as Larry) and James (known as Jim) Seder, and Larry’s daughter, Robin Seder Isenberg. The Court will at times refer to the three collectively as the Seders. Where distinction between the brothers is necessary, the Court will use their first names, not out of any disrespect, but for clarity.

The bank also seeks judgment against CCNNE, its parent, Cobblestone Corporation, and its parent, Redes Holding Corporation, based on default entered against them on June 21, 2010, for their failure to appear by counsel in this action, after their previous counsel had been permitted to withdraw. As to these defendants, the default establishes CCNNE’s liability for breach of its credit agreement, and the two parent corporations’ liability for breach of their guarantees. The amount of damages to be awarded remains for determination, which the Court will address infra.

Many of the exhibits were never referred to either at trial, or in closing arguments, or in proposed findings. Aside from the cost to the parties, excess volume increases the Court’s burden, and tends to delay the outcome.

TNhe "Facts Stipulated by Plaintiff Bank of America, N.A., and Defendants BDO Seidman, LLP, Lawrence R. Seder, James K. Seder and Robin Seder Isenberg,” filed with the Court on December 22, 2011, are incorporated herein. The Court will not repeat the facts set forth in that document, except as necessary, for clarity. The “Facts Stipulated by Plaintiff Bank of America, N.A. and Defendant BDO Seidman, LLP,” filed with the Court on the same date, in which the Individual defendants do not join, binds the bank and BDO but not the individuals. The Court treats that document as incorporated herein for purposes of the bank’s claims against BDO, but not the' bank’s claims against the individuals. Where the Court’s findings reflect facts stated in that document in relation to the claims against the individual defendants, the parties should understand that the Court makes those findings independently based on the evidence.

Jim Seder has never been a member of any bar.

The Seder brothers had ambitions for Redes and/or Cobblestone to expand into other lines of business, and it appears that, at least in the early years, Redes had some holdings in certain other entities. For most of the life of the three entities, and during the period most pertinent to the issues before the Court, CCNNE’s lending business was the only business activity any of the three entities conducted.

The series of bank mergers that resulted in Bank of America being CCNNE’s lender is detailed in the parties’ stipulation.

Some of CCNNE’s transactions were in the form of equipment leases. These were functionally financing transactions, through which customers obtained possession and use of equipment (such as trucks, printing presses, and the like) that they could not otherwise purchase, while CCNNE held title to the equipment (as opposed to liens on it), receiving lease payments from the customers instead of loan payments. Many of the documents submitted in evidence use the words “lease” and “loan” interchangeably, treating the two types of contracts as functionally the same. The Court will generally use the term “contracts” to encompass both.

A small number of other people, including Robin’s sister, worked in the business from time to time, but did not have roles of significance to the issues in this case.

In approximately 1994, CCNNE had some discussions with a brokerage firm regarding the possibility of securitizing its accounts. In that context, a representative of that firm *526 prepared memoranda purporting to document CCNNE’s policies and procedures for credit evaluation and for managing accounts. Those memoranda did not accurately reflect CCNNE’s practices, and CCNNE did not adopt practices to conform to the memoranda. The memoranda nevertheless remained in CCNNE’s flies, and became at least part of the basis for BDO’s understanding of CCNNE’s practices.

As will be discussed further infra, other techniques for addressing a customer’s inability to pay were to transfer funds on behalf of the customer from a so-called “special hold-back account,” which had been funded by amounts withheld from brokers’ commissions, or to use funds from proceeds of earlier loans that had been held as “unapplied cash.”

 Apparently brokers agreed to, or at least accepted this arrangement. In substance, it appears, the commissions the brokers actually expected and received were less than stated, with the difference functioning as a reserve to secure the customers’ payment.

 As will be discussed further infra, such overstatement in financial statements was in violation of GAAP.

These inadequacies may have been related to the bank’s decision to manage the account in its “middle market” group, rather than in other units that had more experience with finance companies, such as its asset-based lending group or its financial institutions group.

The bank’s annual profit from the CCNNE account was generally in the range of about $250,000.

If such executed documents ever existed, no one has been able to find them. No witness testified to their execution. The absence of those documents became a problem for the bank later, as will be discussed infra

 As will be discussed further infra, a 2003 amendment required annual audited financial statements of CCNNE. CCNNE provided such statements, audited by BDO, for the years ending September 30, 2003, and September 30, 2004, in late January of 2004 and 2005, respectively.

Ihe agreement did not define charge-offs, or specify any circumstances in which CCNNE was required to take a charge-off. Generally Accepted Accounting Principles (GAAP) do not establish a standard for when a charge-off is required. As indicated supra if CCNNE had taken charge-offs for the amounts it covered through the special hold-back account, its charge-offs would have exceeded 2% throughout 1999 and 2000.

The most obvious example is that Cobblestone regularly, and Redes occasionally, showed a net loss, which was an event of default under the credit agreement.

The 1999 amendment did not define “credit problems” or establish a mechanism or standard to determine whether a rewrite was because of delinquency or credit problems.

The length of the term of a loan or lease is referred to as its “tenor.”

The bank’s policy was to conduct field examinations annually, but it did not always do so in practice. As indicated infra a period of some 25 months passed between field examinations in May of 1999 and July of 2001, and then 17 months from July of 2001 until the next examination in December of 2002. Apparently, although the record is less than clear on the point, at least the earlier of these gaps related to the merger of BankBoston into Fleet Bank.

The Court (Hinkle, J.) dismissed the bank’s c. 93A claim against BDO (count III) on BDO’s motion for summary judgment.

The Court treats the other affirmative defenses set forth in BDO’s answer as waived.

With respect to the fifth element, the SJC has observed: ‘The better reasoned decisions interpret §552 as limiting the potential liabiliiy of an accountant to noncontractual third parties who can demonstrate actual knowledge on the part of accountants of the limited — though unnamed — group of potential [third parties] that will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence. The accountant’s knowledge is to be measured at the moment the audit report is published, not by the foreseeable path of harm envisioned by litigants years following an unfortunate business decision.” Nycal, 426 Mass. at 498 (internal quotations and citations omitted). That rule, the Court reasoned, “will preclude accountants from having to ensure the commercial decisions of nonclients where, as here, the accountants did not know that their work product would be relied on by the plaintiff in making its investment decision.” Id. at 500.

As discussed supra the departures from GAAP in the audited consolidated financial statements all arise from the determination of reserves. The other significant departure from GAAP — the inclusion of checks from CCNNE to itself in figures for revenue received — appear only in audited statements only in the supplemental materials for FY1999-2004, and in reports for CCNNE alone for 2003 and 2004.

BDO cites a number of cases holding that statements regarding reserves in financial statements in SEC filings could not give rise to liability for misrepresentation because they were opinion, rather than fact. E.g. Fait v. Regions Financial Corp., 655 F.3d 105, 110-11. The Court does not read these cases as holding that statements regarding reserves can never be fact; rather, the cases address specific claims in specific circumstances that differ from those presented here, particularly with respect to the departures from GAAS found supra

As indicated supra at the same time that Larry Seder engaged in a pattern of deception, CCNNE did provide information to the bank from which it could, and reasonably should, have discerned the truth.

In evaluating this issue, the Court does not consider Larry Seder’s contention that the bank failed to meet a standard of commercial reasonableness in selling its collateral. Seder lacks standing to raise that issue, because he is not a debtor under the credit agreement. See G.L.c. 106, §9-610. The Court does consider whether Seder proved that the bank failed to mitigate its damages by the manner in which it sold its collateral, but concludes that he did not. In the circumstances presented, including the lack of adequate documentation, the evidence does not show that the bank reasonably could have obtained a higher price for the collateral.

The Court does not adopt Mr. Devor’s theory that all amounts CCNNE collected after a particular point in time would have inured to the benefit of the bank. CCNNE’s relationships with its customers, although an inadequate basis for its lending decisions, did elicit payments that the Court cannot assume would have occurred after a takeover by the bank.