JOHN M. O'CONNOR *vs.* MERRIMACK MUTUAL FIRE
INSURANCE COMPANY.

No. 06-P-1750.

Middlesex. October 5, 2007. - November 24, 2008.

Present: PERRETTA, BERRY, & TRAINOR, JJ.

*Superior Court. Contract,* Insurance, Performance and breach, Promissory
estoppel, Implied covenant of good faith and fair dealing, Misrepresentation.
*Insurance,* Fire, Amount of recovery for loss, Replacement,
Misrepresentation. *Negligence,* Misrepresentation. *Consumer Protection
Act,* Unfair or deceptive act. *Value.*

This court declined to subject a trial court judge's general and subsidiary find-
ings to de novo review, where the evidence in the case on appeal was not
limited to explanations and descriptions of the documentary evidence, but
included three days of trial testimony relevant to factual questions raised in
the complaint. [210-211]
At the jury-waived trial of a civil action asserting claims arising from the
methodology used by the defendant insurer to value the loss suffered by
the plaintiff insured, the judge did not err in determining that the insured,
who sought a higher value based on a writing extraneous to the written
insurance policy, failed to demonstrate that the insurer had committed a
breach of the terms of the policy [211], that the extraneous writing had
established a contractual obligation on the basis of promissory estoppel
[212], or that the defendant had committed a breach of the covenant of
good faith and fair dealing [212]; further, nothing in the controlling evidence
suggested that the insurer acted with such a wilful disregard of the facts as
to amount to fraud [212-213] or that the insured had justifiably relied on
the purportedly false information supplied to him by the insurer in the
extraneous writing so as to give rise to a claim of negligent misrepresenta-
tion [213-216] or a claim under G. L. c. 93A [216-217].

CIVIL ACTION commenced in the Superior Court Department on
October 2, 2001.

The case was heard by *Joseph M. Walker, III,* J.

*Seth H. Hochbaum* for the plaintiff.

*David M. Crowley* for the defendant.

PERRETTA, J. After a fire destroyed a commercial building

(property) owned by John M. O'Connor and insured by Merrimack Mutual Fire Insurance Company (Merrimack), a dispute arose between them concerning the methodology used by Merrimack to value the loss. O'Connor then brought this action against Merrimack asserting numerous tort and contract claims as well as violations of G. L. c. 175, § 181, and G. L. c. 93A. After a jury-waived trial, the judge determined, based on the terms of the insurance policy, that Merrimack had a choice of methods to calculate O'Connor's loss and found for Merrimack on all claims. We affirm the judgment.

1. *The facts.* There is no dispute concerning the procedural background of the controversy. After Merrimack determined that the amount due O'Connor for his loss caused by the fire was less than the policy limit, O'Connor made a timely demand for reference procedures. See G. L. c. 175, § 100. The referees awarded O'Connor more than the amount Merrimack had determined to be due but less than the policy limit. See note 5, *infra.* Although Merrimack paid O'Connor the full amount of the referees' award, O'Connor brought this action against Merrimack.

We relate the relevant facts presented at trial based upon the numerous exhibits and the testimony accepted by the judge. Prior to August, 1995, the property was insured under a property and casualty insurance policy issued by Utica National Insurance Group (Utica). Under Utica's policy, the property was insured on an actual cash value basis with an $800,000 limit of insurance. In anticipation of the expiration of his policy with Utica and wanting a different insurer to provide him with the same coverage as provided under Utica's policy, O'Connor filed an application for a policy on the property with Merrimack on August 15, 1995. On his application, he disclosed that the property was insured by Utica on an actual cash value basis in the amount of $800,000.

That same month, O'Connor purchased from Merrimack an $800,000 property and casualty insurance policy. Under the terms of the policy, Merrimack's coverage on the building would be determined on a actual cash value basis up to the amount of the policy limit of $800,000. The policy also contained the Massachusetts standard fire insurance provisions, see G. L. c. 175, § 99, insuring the property against loss by fire "to the extent of

[its] actual cash value." Although the policy does not define the term "actual cash value," it expressly provides that the policy "contains all the agreements between [O'Connor] and [Merrimack] concerning the insurance afforded" and that the terms of the policy "can be amended or waived only by endorsement issued by [Merrimack] and made a part of this policy."[1]

The following month, Merrimack conducted a loss control survey or inspection of the property, which showed that the property was underinsured at the existing policy limit of $800,000.[2] Consequently, on September 12, 1995, Timothy Andersen, a manager in Merrimack's commercial underwriting department, sent a letter to Joseph Mascia, the insurance agent through whom O'Connor had purchased the policy, to advise him of its findings in respect to O'Connor's policy. In this letter Andersen stated that Merrimack "ha[d] received [its] loss control inspection of the [property]" and that the inspector had noted a "potential insurance to value problem." As explained by Andersen in his letter:

> "Specifically, if you will note the attached Value Estimate, you can see that even with the Building [actual cash value] option, an increase is in order. Allowing for a margin of error in the estimator, it would appear that an increase to at least $1,300,000 is needed. . . . [P]lease review this issue with the insured and advise of your findings."

A one-page report was attached to the letter. The report, which Andersen referred to in his letter as a "Value Estimate," was labeled "STANDARD REPORT" and showed that the property

---

[1]Flexibility as to the manner by which loss payment was to be made was provided by the policy, which stated:

"At our option, we will either:

"(1) Pay the value of lost or damaged property;

"(2) Pay the cost of repairing or replacing the lost or damaged property;

"(3) Take all or any part of the property at an agreed or appraised value; or

"(4) Repair, rebuild or replace the property with other property of like kind and quality."

[2]According to the undisputed testimony at trial, an "inspection report" or "loss control survey" provides a report of the physical attributes of a building. A "replacement cost estimator" is part of a document that is part of an "inspection report."

had an "insurable cash value" of $1,456,202 based upon a re-placement cost less ten per cent depreciation. Andersen testified at trial that as used in his letter of September 12, 1995, the term "actual cash value" was synonymous with the term "insurable cash value."

There was also testimony to show that Mascia reviewed Andersen's letter and estimate with O'Connor, who expressed the opinion that Merrimack's estimate overstated the cost of replac-ing the property, and that he could rebuild a structure superior to the one then existing for $1,000,000. Mascia relayed O'Con-nor's opinion to Andersen who, in turn, requested that Mascia forward him copies of any appraisals of the property that showed values different from those shown on the value estimate set out in his previous letter and attached report. When Andersen re-ceived no response to his request, he sent another letter to Mas-cia in which he asked whether O'Connor wished to pursue the matter further. Andersen further advised that unless Merrimack was informed within ten days whether O'Connor wished to press his disagreement concerning the insurance to value issue, Merrimack would assume that O'Connor was content with his current policy limit of $800,000.

In November, 1996, Mascia advised Merrimack that he had conferred with O'Connor on the issue of the value of his prop-erty and that O'Connor agreed to increase his policy limit to $1,300,000. O'Connor then increased his coverage to the amount recommended by Merrimack and thereafter renewed the policy annually through August 11, 1999.[3]

O'Connor testified at trial that he understood that the terms

[3]There was evidence at trial, essentially uncontradicted, that the policy limit was increased to $1,300,000 in November or December, 1995, and that O'Connor thereafter paid the increased premium. The judge found that Mascia had sent a letter to Andersen in November, 1996, indicating that O'Connor had "agreed to increase the value [of the property] to $1.3 million per [Ander-sen's] recommendation in order to have the property insured to value." However, Andersen testified that based on Merrimack's date stamp on the let-ter, his own handwritten notes, and the timing of the increase in O'Connor's coverage limit in 1995, he believed that the letter was misdated and was, in fact, sent in November, *1995*.

Any uncertainty about the exact date of O'Connor's increase in the policy limit has no particular effect on the outcome of this appeal. The undisputed fact is that at the time of the fire, O'Connor had "paid all appropriate premiums

"actual cash value" or "insurable cash value" as used in Andersen's letter of September 12, 1995, to be the replacement cost of the property less a ten percent allowance for depreciation. As explained by O'Connor, he had insured the property with Utica on an actual cash value basis immediately prior to purchasing the policy with Merrimack. He also related that as of 1995, he was a Massachusetts licensed real estate broker and owned six real estate properties. He handled some of the legal, financial, and business dealings concerning those properties, but he "never utilized [his license] for working purposes."[4]

On the date of the fire, February 20, 1999, the policy limit was $1,476,730.35.[5] Merrimack determined the amount due O'Connor was $1,146,248. Based upon the evidence before him, the judge found the methodology by which Merrimack arrived at the figure of $1,146,248 was as follows.

> "Merrimack employed Certuse Adjustment, Inc. ('Certuse') to estimate the actual cash value loss and damage. Certuse calculated the Actual Cash Value loss, both by estimating replacement cost less depreciation, less deductible ($1,462,839.26), and by obtaining appraisals of value from Meredith & Grew, Inc., by both the Income Approach ($980,000.00) and the Sales Comparison Approach ($990,000.00). Certuse added its estimated demolition cost to each of these figures, producing totals of $952,252.00, $1,092,952.00, and $1,102,952.00, respectively. Merrimack, utilizing the so-called 'broad evidence rule,' added those three figures and the deductible together, and divided by four to get the average of the four figures, . . . $1,146,248.00."

2. *The issues.* Each count of O'Connor's complaint is based upon Andersen's letter of September 12, 1995, and the attached "STANDARD REPORT," which, he claims, when read together,

---

to obtain coverage in the amount of $1,300,000" notwithstanding the testimony concerning his communications with Merrimack vis-à-vis Mascia and Anderson concerning his (O'Connor's) personal opinion as to the replacement cost of the property.

[4] We note in passing that it does not follow from O'Connor's testimony that he never used his real estate license for business purposes that he was ignorant of and unsophisticated about his financial interests in the property.

[5] This amount reflects an "inflation guard endorsement" in the policy.

give rise to Merrimack's legal obligation to determine the "actual cash value" of his property as of the date of the fire and up to the policy limit on the basis of a replacement cost less ten percent depreciation, an amount more than that determined due him by Merrimack and the referees.[6]

The judge's analysis of each of O'Connor's claims is premised on his correct observation that as used in Massachusetts standard fire insurance policies and G. L. c. 175, § 99, the term "actual cash value" does not import a single standard for determining the value of insured property. Rather, Massachusetts employs the "broad evidence rule." See *Kingsley* v. *Spofford*, 298 Mass. 469, 475-476 (1937), quoted at length in *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. 603, 607-608 (1961); *Interstate Gourmet Coffee Roasters, Inc.* v. *Seaco Ins. Co.*, 59 Mass. App. Ct. 78, 83-84 (2003). See also 12 Couch, Insurance § 175:33 (3d ed. 1998) ("[u]nder this rule, the trier of facts may consider any evidence logically tending to the formation of a correct estimate of the value of the insured property at the time of loss").

3. *Discussion.* In taking up O'Connor's arguments on each of his claims, we adhere to the limits of the established scope of our review. See *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 792 (1986); *Mayer* v. *Cohen-Miles Ins. Agency, Inc.*, 48 Mass. App. Ct. 435, 438 (2000).

In this regard, we think O'Connor's reliance upon *Stamper* v. *Stanwood*, 339 Mass. 549 (1959), as support for his contention that the judge's general and subsidiary findings are subject to de novo review is misplaced. The evidence in this case was not limited to "explanations and descriptions of the documentary evidence." *Id.* at 551. Rather, the evidence included not only documentary evidence but also testimony elicited in the course of three days of trial. That testimony was relevant to factual questions raised by O'Connor's complaint, i.e, his understanding of the information provided in Andersen's letter and the attached

---

[6]O'Connor challenges the judge's determinations on each of the counts of his complaint except for that based upon an alleged violation of G. L. c. 175, § 181. Section 181 pertains to misrepresentations made by an insurer. O'Connor makes no separate argument on this count. His failure to do so is of no consequence because of the conclusions we reach in respect to his claims based upon allegations of misrepresentation.

report, his conversations with Mascia concerning the estimate contained in the report, the beliefs he formed in respect to the valuation methodology to be used in adjusting loss under the policy, and whether he, in fact, acted in reliance upon those beliefs. In these circumstances, we think the appropriate standard of our review is that set out in Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 429-431 (1980).

a. *Breach of contract.* O'Connor has shown no error in the judge's determination that he failed to show a breach of the terms of his policy with Merrimack. He does not dispute that the policy constituted a binding contract or that the policy itself does not define the term "actual cash value." He instead argues that "[a]lthough the term 'actual cash value' is undefined in the policy," Andersen's letter and the value estimate "assigned a definition and means of calculating the actual cash value of the property for purposes of the [p]olicy."

Other than citing to authorities in which the elements of an action for breach of contract are set out, O'Connor's argument on this claim is unaccompanied by discussion of any legal principles or citation to pertinent legal authority that might arguably support a conclusion that the Andersen letter and the value estimate therein set out controlled or otherwise amended the terms of the policy. The terms of the policy expressly provided that it "contains all the agreements between [O'Connor] and [Merrimack] concerning the insurance afforded" and that its "terms can be amended or waived only by endorsement issued by [Merrimack] and made a part of [the] policy."

We will not speculate as to what legal theories might have given support to O'Connor's claim of a breach of contract by Merrimack. See *Patel* v. *Amresco SBA Holdings, Inc.*, 69 Mass. App. Ct. 192, 197 (2007), wherein we held "that it is the obligation of appellate counsel and not the court to structure an analysis, supported by [appropriate] citation to authorities, that will assist the court in reaching a decision." See also Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Based upon O'Connor's "argument" on this count of his complaint, we consequently conclude that he has failed to show error in the judge's conclusion that Merrimack was entitled to judgment on this count of the complaint.

b. *Promissory estoppel.* Characterizing Andersen's letter and the attached report as a promise to pay him the replacement cost less ten per cent and relying upon *Loranger Constr. Corp.* v. *E.F. Hauserman Co.,* 376 Mass. 757, 760-761 (1978) (*Loranger*), and *Rhode Island Hosp. Trust Natl. Bank* v. *Varadian,* 419 Mass. 841, 848-850 (1995) (*Varadian*), O'Connor argues that a contractual obligation was established on the basis of promissory estoppel.

O'Connor's argument on this claim is based upon the erroneous characterization of the contents of Andersen's letter and attached report as a "promise." Moreover, his argument fails to address the fact that in neither *Loranger, supra,* nor *Varadian, supra,* did the court consider or discuss a claim of contractual obligations based upon writings or representations extraneous to and in contradiction of the written contract. See *Patel* v. *Amresco SBA Holdings, Inc.,* 69 Mass. App. Ct. at 197; Mass.R.A.P. 16(a)(4). Consequently, we conclude that O'Connor has failed to demonstrate that the judge erred in concluding that Merrimack was entitled to judgment on O'Connor's claim based upon principles of promissory estoppel.

c. *Breach of the covenant of good faith and fair dealing.* O'Connor's argument on this count of his complaint requires no lengthy discussion. It is enough to state that his failure to demonstrate the existence of an enforceable contract that conforms to his reading is fatal to his contention that Merrimack violated that contract's implied covenant of good faith and fair dealing. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.,* 441 Mass. 376, 385 (2004) (implied covenant of good faith and fair dealing not to be invoked "to create rights and duties not otherwise provided for in the existing contractual relationship").

d. *Intentional or reckless misrepresentation.* To prove his claim of an intentional or reckless misrepresentation, O'Connor was required to "prove that [Merrimack] made a false representation of a material fact with knowledge of its falsity for the purpose of inducing [him] to act thereon, and that [he] relied upon the representation as true and acted upon it to his damage." *Barrett Assocs., Inc.* v. *Aronson,* 346 Mass. 150, 152 (1963), quoting from *Kilroy* v. *Barron,* 326 Mass. 464, 465 (1950). For purposes of analyzing O'Connor's argument on this count of his

complaint, we will assume that he reasonably could have construed the matters set out in Andersen's letter and attached report to be an implied rather than express representation concerning the meaning of the term "actual cash value."

Such an assumption, however, gains O'Connor nothing in view of the absence of anything in the exhibits or testimony accepted by the judge to show that Andersen's letter and the attached report was false, that Andersen or others acting on Merrimack's behalf were aware of the alleged fact that the letter and report were ambiguous or susceptible to the interpretation O'Connor gave them, or that O'Connor's understanding of the letter and report was that the policy insured his property on the basis of its replacement cost less ten percent depreciation value. Put more simply, we find nothing in the controlling evidence that shows or suggests that Merrimack acted with such a wilful disregard of the facts as to amount to fraud. See *Christian* v. *Mooney*, 400 Mass. 753, 764 (1987), cert. denied, 484 U.S. 1053 (1988).

### e. *Negligent misrepresentation.*

"In order to recover for negligent misrepresentation[,] a plaintiff must prove that the defendant (1) in the course of his business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information."

*Nota Constr. Corp.* v. *Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 19-20 (1998). As stated in *Sound Techniques, Inc.* v. *Hoffman*, 50 Mass. App. Ct. 425, 432-432 (2000), "[a]n individual who makes negligent misrepresentations has honest intentions but has failed to exercise due care." See *Kitner* v. *CTW Transp., Inc.*, 53 Mass. App. Ct. 741, 749 (2002); Restatement (Second) of Torts § 552 (1977). In support of this count, O'Connor claims that "the falsity of the information consisted of [Merrimack's] failure to divulge to [him] all of the material facts bearing upon the means by which the actual cash value of the Property would and/or may be calculated in the event of its loss."

O'Connor's argument is flawed in several respects. In the

first instance, and as previously stated in part 2, *supra*, neither Massachusetts standard fire insurance policies nor G. L. c. 175, § 99, imports a single standard for determining the value of insured property; instead, Massachusetts employs the "broad evidence rule." In this regard, and again as previously noted, the policy set out how a loss payment could be made. See note 1, *supra*. O'Connor had no trouble in accepting the terms of the policy. It was not until Andersen's letter and attached report that O'Connor allegedly came to a different understanding of the terms of his contract with Merrimack.

Additionally, we do not see anything in Andersen's letter and the attached report that expressly or impliedly purported to define the term "actual cash value," or expressly or impliedly represented that the depreciated replacement cost would be the exclusive means for determining the value of the property in the event of a loss. Rather, Andersen's letter made clear that the attached report was a "loss control inspection," which revealed a "potential insurance to value problem" that prompted him to advise O'Connor that the policy limit should be increased "to at least $1,300,000." When all is said and done, we see nothing in Merrimack's policy or Andersen's letters to support O'Connor's allegation that he was supplied with false information, negligently or otherwise.

Even were we to ignore the express terms of the policy, see note 1, *supra*, as well as Andersen's letter and attached report, and, instead, assume that Merrimack supplied O'Connor with false information because of its failure to exercise reasonable care, we would nonetheless conclude that O'Connor failed to sustain his burden of proof to show that he justifiably relied upon the purportedly false information given him by Merrimack. Although O'Connor testified that he understood and relied upon the information furnished him by Merrimack, i.e., the policy as well as Andersen's letter and attached report, to mean that the value of his property would be determined on the sole basis of its depreciated replacement cost, the judge was not required to accept his testimony. The judge did not make an *express* finding whether he accepted O'Connor's testimony that he relied on Andersen's letter and attached report as a representation that the term "actual cash value" meant depreciated replacement cost and that in the event of a loss that methodology of valuation

would be the exclusive methodology used to determine the amount of his loss.[7]

However, any notion of justifiable reliance on the part of O'Connor is contradicted by the facts expressly found by the judge. O'Connor was a licensed real estate broker, see note 4, *supra,* who was represented by an insurance agent whom he had instructed to obtain a policy providing the same coverage as had his prior insurer. While represented by his agent, Mascia, O'Connor accepted the terms of Merrimack's policy. He also reviewed Andersen's letter and the attached report with Mascia and informed Mascia that Merrimack had overstated the cost of replacing the building, and that he could rebuild the structure superior to that then existing for $1,000,000. When Mascia relayed O'Connor's opinion to Andersen, Andersen's response was to request that Mascia send him copies of any appraisal reports O'Connor had to support his opinion of the property's value. After Andersen neither heard nor received anything from Mascia, he sent another letter advising that if he were not informed within ten days of O'Connor's intentions concerning the insurance to value issue expressed in his previous letter and the attached report, Merrimack would assume that O'Connor was content with a policy limit of $800,000. About a month or two later, Mascia advised Merrimack that he had again conferred with O'Connor who had agreed to increase the policy limit to $1,300,000.

To summarize the findings: O'Connor was far from a neophyte in real estate matters; he had his own opinion as to the replacement cost of his building; he had consulted with and had given instructions to his insurance agent on the matter of agreeing to an increase in the policy limit; and he failed to respond to Merrimack's invitation that he supply them with copies of any appraisals he might have and, instead, ultimately notified

[7]It appears from the judge's memorandum of decision that he found it unnecessary to consider the question of justifiable reliance because of his conclusion that even had Merrimack made a negligent misrepresentation, the alleged misrepresentation did not cause O'Connor any pecuniary loss, since he received more by accepting Merrimack's recommendation to increase the policy limit than he would have received under the original limit. The conclusions we reach on this count of O'Connor's complaint make it unnecessary for us to consider whether the judge was correct in concluding that O'Connor had failed to show a pecuniary loss.

Merrimack that he would increase his policy limit to $1,300,000. We think the judge's express findings on these facts clearly and impliedly establish that he did not accept O'Connor's self-serving testimony. For us to conclude otherwise would require us to ignore the judge's express findings. Instead, we conclude that O'Connor failed to establish his burden of proof on two of the necessary elements of negligent misrepresentation, namely, false information and justifiable reliance.[8]

f. *Violation of G. L. c. 93A, § 11.* O'Connor claims that Merrimack's negligent misrepresentation gives rise to liability under G. L. c. 93A. Even had we concluded that Merrimack had made a negligent misrepresentation to O'Connor, that conclusion would not axiomatically entitle O'Connor to damages under c. 93A. More is required. While "a negligent misrepresentation may be so extreme or egregious as to constitute a violation of G. L. c. 93A," *Marram* v. *Kobrick Offshore Fund, Ltd.,* 442 Mass. 43, 62 (2004), a negligent act standing by itself does not give rise to a claim under c. 93A. See *Walsh* v. *Chestnut Hill Bank & Trust Co.,* 414 Mass. 283, 288 (1993) (negligent act standing by itself does not give rise to claim under c. 93A); *Meyer* v. *Wagner,* 429 Mass. 410, 424 (1999) (unfair or deceptive act requires more than finding of negligence). Compare *Glickman* v. *Brown,* 21 Mass. App. Ct. 229, 234-235 (1985), a case in which the court held on facts tantamount to fraud that "a deceptive act which is the result of a defendant's negligence is actionable without more."[9]

We will assume for purposes of decision that Merrimack was

---

[8] O'Connor also argues that the judge was in error in finding for Merrimack on his count alleging fraud and deceit. As O'Connor states in his brief, "fraud is proven upon a showing of a (1) false representation, (2) of a material fact, (3) with knowledge of its falsity, (4) for the purpose of inducing action thereon." He also acknowledges that reliance is an element of fraud.

Based upon the conclusions we have reached in respect to O'Connor's claims for intentional and negligent misrepresentation, we see no need to address this argument on this count of his complaint.

[9] As set out in O'Connor's brief, fraud is established upon proof of a false representation of a material fact, express or implied, made with knowledge of its falsity for the purpose of inducing action thereon, as well as proof of reliance on any such false representation. See *Danca* v. *Taunton Sav. Bank,* 385 Mass. 1, 8 (1982); *Nei* v. *Burley,* 388 Mass. 307, 311 (1983); *Briggs* v. *Carol Cars, Inc.,* 407 Mass. 391, 396 (1990). It follows from our discussion set out in parts 3d and 3e, *supra,* that fraud is not a viable issue before us.

negligent in its representations to O'Connor and consider whether its conduct was "extreme or egregious." We find nothing in the facts expressly and implicitly found by the judge to show that Merrimack was or should have been aware of any particular concern that O'Connor had regarding the methodology to be used in determining the value of any loss.

O'Connor was aware of the terms of the policy, see note 1, *supra*, and there was correspondence between Andersen and Mascia about Andersen's letter and attached report. Nothing in that correspondence could reasonably be construed as notice to Merrimack that O'Connor was confused or had questions about the terms of the policy, the contents of the letter and attached report, or that the methodology to be used in valuing loss was of particular concern to him. Rather, that correspondence concerned O'Connor's unsubstantiated opinion that the depreciated replacement cost of the building as set out in the report was overstated.

Moreover, O'Connor decided to increase his policy limit to the amount recommended by Andersen without complying with Merrimack's request to be provided with any appraisals he, O'Connor, might have to support his opinion, and only after Merrimack advised him that it would assume from his lack of response to its inquiries that he did not wish to increase his policy limit. Contrast *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 260 (1999) (recipient of negligent misrepresentation had expressed concern about matter in issue).

Based upon an application of controlling precedent to the record and arguments before us, we would be hard put to conclude that any alleged negligent misrepresentation made by Merrimack constitutes an unfair or deceptive act within the meaning of c. 93A. Consequently, this count of O'Connor's complaint also fails.

4. *Conclusion.* It follows from what we have said in respect to each count of O'Connor's complaint that we find no error in the judge's order for judgment for Merrimack.

*Judgment affirmed.*