# United States Court of Appeals
## For the First Circuit

No. 18-1602

G., a 12-year-old minor suing by a fictitious name for privacy
reasons; MOTHER and FATHER, suing under fictitious names to
protect the identity and privacy of G., their minor child,

Plaintiffs, Appellants,

v.

THE FAY SCHOOL, by and through its board of trustees;
ROBERT GUSTAVSON,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

John J.E. Markham, II, with whom Markham & Read was on brief,
for appellants.
Sarah Goldsmith Schwartz, with whom Anthony L. DeProspo, Jr.
and Schwartz Hannum PC were on brief, for appellees.

July 17, 2019

**LIPEZ**, **Circuit Judge**.    Appellant "G," a 12-year-old minor, and G's parents appeal from the entry of summary judgment for the Fay School, Inc., and Fay's Head of School, Robert Gustavson.[1]    G, formerly a student of the Fay School, allegedly suffers from Electromagnetic Hypersensitivity ("EHS"), a sensitivity to electromagnetic fields ("EMFs").    The family brought suit against Fay after the school refused to remove wireless internet from its classrooms to accommodate G's condition.    In the only claims remaining on appeal, the family alleges unlawful retaliation for demands for an accommodation for G's condition in violation of Title V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a), breach of contract, and misrepresentation.

We affirm the district court's rejection of these claims, concluding (1) as an issue of first impression for our court, that damages (compensatory and nominal) are not an available remedy for a Title V retaliation claim premised upon an exercise of rights under Title III of the ADA; and (2) that the family has failed to raise triable issues of fact as to the contract and misrepresentation claims.

---

[1] G sues under a fictitious name to protect his privacy as a minor.  G and his parents are, hereinafter, collectively referred

We recite the facts in the light most favorable to the G family, "the party resisting summary judgment." Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 54 (1st Cir. 2011).

**A. The Parties**

The Fay School is an independent day and boarding school in Southborough, Massachusetts. It enrolls children from pre-kindergarten through the ninth grade, touting its ninth-grade year as "a capstone" year that provides its graduates "new opportunities for personal growth as . . . athletes, artists, and leaders." In a yearly parent-student handbook, the Fay School outlines its "core values," including "academic excellence," "earnest effort," "honorable conduct," "dedicated service," and "wellness of mind, body and spirit." To enroll at the school, students and their parents must sign an enrollment contract stating that they will "agree to comply with the [s]chool's policies, rules and standards . . . as stated in the [h]andbook." In this contract, parents and students must also acknowledge that the handbook "does not constitute a contract between [them] and the School." The G family signed this enrollment contract.

---

to as "the G family" or "the family." The Fay School, Inc. (hereinafter, "the Fay School" or "the school") and Fay's Head of School, Robert Gustavson, are, hereinafter, collectively referred to as "Fay."

As the handbook advises, technology is "an integral part of the academic and residential programs" at the school. Classrooms are equipped with "projectors, video displays, [and] Apple TV."[2] In or around 2009, the school installed wireless internet ("Wi-Fi"), with access points throughout its campus, to "allow[] [for] increased mobility and flexibility within the classrooms" not possible with hardwired devices. The Wi-Fi is frequently accessed by students and teachers at the school. Most upper-level teachers use "Google Docs," an internet-based program, as part of classroom instruction. Tablet computers are provided by the school to younger students for in-classroom use, and the school requires that all seventh-, eighth-, and ninth-grade students bring their own laptops or tablets to school for computer-based tasks. The students use these devices to access the Fay School's Wi-Fi.

G was a student at the Fay School between 2009 and 2015. He allegedly suffers from EHS, and claims, as a result, to experience "headaches, nausea, nose bleeds, dizziness and heart palpitations" when exposed "for long periods of time . . . to radio

---

[2] Apple TV is a digital media player that can receive digital data, such as music or video, from a specific source (like an iTunes library on a computer) and stream it to a television or other video display. See John-Michael Bond, *Why Apple TV can't compete in 2018*, The Daily Dot (March 23, 2018), https://www.dailydot.com/debug/what-is-apple-tv-cost/.

wave radiation emitted from various types of electronic devices, including Wi-Fi transmissions to and from computers."

## B. Factual History

G entered the Fay School as a first-grader in 2009. Several years after his enrollment, in the summer and fall of 2012, the school upgraded its wireless internet system to operate at a higher frequency band. In October of that year, G's mother ("Mother")[3] began expressing concerns about the harmfulness of Wi-Fi generally, stating in an email to the school that "there is a direct link to illness and wi-fi radiation." In 2014, Mother again expressed these concerns to various individuals at the school, including in an email to the school nurse in which she stated that she "ha[d] been working with several engineers and experts [on the subject of EMF exposure]," had encountered "hundreds of studies . . . concerning the safety of using Wi-Fi," and advised "immediate proactive steps." She also wrote to the head of the school's board of trustees ("the Board") concerning the dangers of Wi-Fi exposure. She requested "immediate proactive steps" and expressed her "confiden[ce] that [he] [would] give [the] topic the attention it deserves." Mother did not mention G or his condition in these communications.

---

[3] G's parents sue under the fictitious names "Mother" and "Father" to protect the identity and privacy of their minor son.

Following Mother's communications, the Head of School, Robert Gustavson, and other Fay School staff members exchanged a series of emails regarding Mother's Wi-Fi concerns. Some of the comments in those emails were dismissive or derisive:

- "It's inappropriate and presumptuous for a parent to contact trustees and demand that a topic be discussed at a Board meeting . . . . [S]he should not be rewarded for going around me [Gustavson]."
- "We are . . . in agreement that we should . . . try to cut this off at the pass."
- "Seems to me that meeting with them [the family] would open a can of worms."
- "Blahahahahahahahaha!" [in response to an email with the subject line "Rabbit Ears and Aluminum Foil]
- "Perhaps it is time to ignore her requests[.]"

On May 15, 2014, Gustavson met with Mother and Father to discuss their Wi-Fi concerns. At the meeting, Mother requested that the school replace its Wi-Fi with ethernet cords to connect to the internet. Following the meeting, the school conducted independent research on the Wi-Fi issue and concluded that evidence of harm was insufficient to require mitigating efforts. On May 23, Gustavson informed Mother of the school's conclusions, requested that all further communications concerning the issue be directed to him, the school's Director of Operations, or the school's Director of Information Technology, and asked that Mother "refrain from contacting other Fay employees or trustees" concerning the issue. Mother continued to email an array of Fay

- 6 -

School staff members concerning the Wi-Fi issue and requested a further meeting to discuss the topic. The Fay School declined her request to meet.

Around this same time, Mother brought G to his primary care provider complaining that her son suffered symptoms, such as chest pressure and stomach pain, when in proximity to Wi-Fi. The provider recorded the discussion but noted that, "at [that] time[,] [he] [could not] support that [Wi-Fi] [was the] cause of . . . [G's] stomach [and] chest issues." Subsequently, Mother sought the advice of an EHS specialist, Dr. Jeanne Hubbuch, explaining that G experienced "[h]eadache[s], dizziness, ringing ears, chest pressure, [and] nausea" at school but that the symptoms "dissipate[d] [at] home where [they] use Ethernet." After meeting with Mother, but not G, Dr. Hubbuch "preliminarily" diagnosed G with "EMF sensitivity" and subsequently advised the Fay School of her diagnosis. The school requested further documentation of G's diagnosis, which the family did not provide.

In September 2014, after Mother and Father continued to contact members of the school community about the dangers of wireless internet, Mother was removed from her role in the Fay School's Parents Association. According to the Parents' Association, Mother was removed because she had organized a discussion on Wi-Fi safety with the Parents Independent School Network ("PIN") and had "strongly le[d] [PIN] to believe" that Fay

and the Parents Association "were aware and in support of this event," even though they were not. The school also sent a letter to Mother and Father setting forth the "terms upon which [the family] [could] remain members of the Fay community." The letter stated in part:

> You have the opportunity and privilege, not the right, to send your child to Fay School. As parents, you do have the right to determine for yourself whether the School's environment is appropriate for your children. However, as previously indicated, we will not engage in further dialogue with you concerning Wi-Fi safety, and we will not allow you to continue to disrupt our school community.

On November 14, 2014, Mother and Father formally asserted, through counsel, that G suffered from EHS and requested that the school accommodate G by (1) providing an immediate meeting with the school's nurse; (2) educating all staff on the dangers of EMF exposure; (3) identifying and marking all EMF sources on campus; (4) allowing G to access the school curriculum through an ethernet cord; (5) engaging an independent third party to quantify the EMF exposure at the school and share findings with parents; (6) reducing the EMF emissions at school to "levels below those known in scientific literature to create biologically disregulating effects;" (7) "mandat[ing] that personal devices be turned off;" and (8) not "ostraciz[ing] or isolat[ing] children in any way while developing or instituting these accommodations." On December 8, the school responded, explaining that it needed

- 8 -

additional medical documentation "to fully evaluate [the family's] requests." The letter stated that "[t]he documentation [the family] [had] provided [was] insufficient [because] (1) it [did] not specify the existence of a disability or explain the need for any reasonable accommodation; and (2) the information d[id] not specify any functional limitations due to any disability."

On February 3, 2015, Dr. Hubbuch examined G. Although Dr. Hubbuch did not diagnose G with EHS, she noted that "if something in school was [the] cause [of G's symptoms], [she would] expect it to persist [the] entire day at school and it does not." On February 25, Mother advised Dr. Hubbuch that G's symptoms had worsened. She did not tell Dr. Hubbuch that, about two weeks earlier, G had hit his head against a tree while sledding and had not been wearing a helmet at the time of that accident. Then, on March 31, Dr. Hubbuch diagnosed G with EHS and recommended that he be accommodated in an environment with reduced exposure to EMFs.

On April 27, 2015, Mother and Father requested, through counsel, that Fay allow them to "take a walk-through tour of G's day at school" to "learn how much exposure there is to Wi-Fi and EMF in each room in which G spends time." The school refused. Subsequently, Fay and the family agreed that G would submit to "independent medical evaluation[s]" by two medical specialists. After the medical opinions were received, if they showed that "EHS is implicated," the school said that it would allow the parents to

do a "walk-through" and would make reasonable attempts to accommodate G.

On June 30, 2015, an independent medical specialist examined G. At the parents' request, the specialist's examination did not include an interview of G separate from his parents. After the examination, the specialist noted G's symptoms -- "[h]eadaches, neuralgia [nerve pain,] . . . [c]hest 'pressure' by parental report[,] . . . [t]innitus [ringing in the ears] by parental report[,] . . . [s]chool performance difficulty" -- but concluded, "[t]here is [a] lack of credible, rigorous and controlled, validated scientific data to support any relationship between electromagnetic radiation and G's myriad reported symptoms." The specialist declined to diagnose G with EHS.

On August 3, 2015, Mother and Father demanded, through counsel, that Fay allow them to conduct a "walk-through" of the school "that week." Then, on August 12, the family filed the original complaint in this action against Fay. The school thereafter agreed to allow the family to conduct a "walk-through" if G completed the second independent medical exam, as earlier agreed upon. On September 10, G was examined by two pediatric neurologists. Neither diagnosed G with EHS.

Between August and October 2015, the family conducted a series of walk-through visits at the Fay School. Following these visits, Fay agreed to install an ethernet port in each of G's

classrooms so that he could connect his laptop to the internet without using a wireless connection and to seat him at least six feet away from other laptop users. Despite these changes, G's symptoms escalated. In December 2015, he took a medical leave of absence. During his leave from the school, G experienced no symptoms.

When G returned to the Fay School, at the end of his medical leave, Mother and Father demanded that the school either remove all wireless internet from G's classrooms or create a separate, Wi-Fi-free classroom for G and his classmates. Fay refused. In January 2016, Mother and Father withdrew G from the Fay School in the middle of his seventh-grade year, and, in February, filed an amended complaint.

Since the amended complaint was filed, G has completed his seventh-, eighth-, and ninth-grade years at private schools that operate without Wi-Fi.

## C. Procedural History

The family filed the operative complaint on February 11, 2016, alleging claims of disability discrimination against the Fay School under Titles III and V of the Americans with Disabilities Act ("ADA"), which, respectively, prohibit disability discrimination in places of public accommodation, see 42 U.S.C. § 12182 ("Title III"), and retaliation for conduct protected under certain provisions of the ADA, including Title III, see 42 U.S.C.

- 11 -

§§ 12182(a), 12203(a) ("Title V").  The family also alleged common law claims of breach of contract, misrepresentation, and negligence against the Fay School and Gustavson, seeking damages and injunctive relief.

Fay moved in limine to exclude the reports, opinions, and testimony of five of the family's expert witnesses, including Dr. Hubbuch.  See G v. Fay Sch., Inc. by & through its Bd. of Trs., 282 F. Supp. 3d 381, 389 (D. Mass. 2017).  The family sought to introduce the evidence of Dr. Hubbuch to establish the existence of EHS and to establish G's particular diagnosis.  After conducting nine days of Daubert hearings, see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993),[4] the district court granted Fay's motion in part, and excluded Dr. Hubbuch's testimony.  In so doing, the court explained that the doctor had failed to identify "a scientifically reliable basis linking the constellation of symptoms reported by G with EHS in order to 'rule in' that particular diagnosis" and had "failed to document or testify to

---

[4] "[I]t is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis."  Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006).  At a Daubert hearing, a judge evaluates the admissibility of expert testimony under the factors articulated by the Supreme Court in the Daubert decision: (1) whether an expert's theory or technique can and has been tested; (2) whether it has been subjected to peer review; (3) its error rate; and (4) its acceptance within the relevant discipline.  See 509 U.S. at 593-94.

- 12 -

her efforts to identify and exclude other environmental factors at the [Fay] School that might cause or contribute to G's symptoms." G, 282 F. Supp. 3d at 391; see Fed. R. Evid. 702(d) (requiring that a qualified expert witness's testimony be based on reliable principles and methods properly applied to the facts of the case).

Fay then moved for summary judgment. The district court, noting that a Title V retaliation claim "does not depend on the success of [a plaintiff's] disability claim," denied summary judgment as to that claim, finding that the family had stated a prima facie case of retaliation. G, 282 F. Supp. 3d at 397 (quoting Jones v. Walgreen Co., 679 F.3d 9, 20 (1st Cir. 2012)). It granted the motion as to the family's other claims, concluding that (1) the family had failed to create a triable issue of fact as to G's disability, as required for the Title III disability discrimination claim; (2) the handbook terms that form the basis of the family's breach of contract claim are insufficiently definite to create a valid contract; (3) the record does not support a finding that Fay made a knowing misrepresentation to the family, as required for the family to prevail on its misrepresentation claim; and (4) the school fulfilled its ordinary duty of care to G by following federally established Wi-Fi safety

- 13 -

limits, negating any possible claim of negligence.  Id. at 396-97, 400-01.[5]

The family moved for reconsideration of the court's order as to their misrepresentation and contract claims, and the school moved for judgment on the pleadings on the family's retaliation claim.  The school argued that the retaliation claim became moot when G completed his ninth-grade year at another private school.  The district court denied the family's motion for reconsideration, finding the family had failed to show "a manifest error of law."  It granted the school's motion for judgment on the pleadings because (1) it determined that damages are not an available remedy for a Title V retaliation claim premised upon opposition to violations of Title III, and (2) the passage of time had rendered the family's claim for equitable relief moot.  The family had sought an order prohibiting the school from retaliating against G, but G had successfully completed the ninth grade (the highest grade that the school offers) at another private school

---

[5] The district court separately concluded that it must enter judgment against the family on the claims against Gustavson in his individual capacity.  G, 282 F. Supp. 3d at 401.  It found insufficient evidence that Gustavson benefited in any way from his participation in the allegedly tortious conduct of the school, as required to "pierce the corporate veil."  Id. (citing Jones v. Experian Info. Sols., Inc., 141 F. Supp. 3d 159, 162 (D. Mass. 2015)).  The family does not address Gustavson's individual liability in its brief.  The claims against Gustavson in his individual capacity are therefore waived.  See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

and there was "no reasonable anticipation that G [would] again be a student at the Fay School."

On appeal, the G family argues that judgment for the school on the Title V claim should be vacated. The family maintains that damages are an available remedy, and argues that, in any event, the claim is not moot because the family has a live equitable claim for nominal damages. The family also argues that summary judgment for Fay on the breach of contract and misrepresentation claims should be vacated. Asserting that the district court erroneously concluded that select terms of the handbook were not a valid contract, the family argues that there are triable issues of fact as to these claims. The family does not press for reversal of the district court's summary judgment for Fay on the negligence claim. Likewise, although the family's appeal initially sought review of the district court's judgment for the Fay School on the Title III claim, the family has since withdrawn its appeal as to that claim, conceding the claim's mootness. The Title III claim, which was purely equitable, became moot when G completed his ninth-grade year, the last year offered by the Fay School.

## II.

We address first the family's appeal of the judgment for the Fay School on the Title V retaliation claim. Title V, 42 U.S.C. § 12203(a), prohibits retaliation against an individual who

has opposed a practice made unlawful under Title III. The question at issue is what remedies are available to a plaintiff who alleges under Title V that he was retaliated against after opposing a practice made unlawful under Title III. Our review of this question of statutory interpretation is de novo.

## A. Statutory Background

The ADA is a comprehensive disability rights statute; its subchapters, known as "titles," protect persons with disabilities in a variety of settings. See 42 U.S.C. § 12101. Title I protects "qualified individual[s] with [] disabilit[ies]" from discrimination in employment. Id. § 12112. As noted earlier, Title III prohibits disability discrimination in any place of public accommodation. See id. § 12182(a).[6] In contrast to Title I, which protects only "qualified individuals," id. § 12112(a); see id. § 12111(8) (defining "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"), Title III applies to any individual with a disability, id. § 12182(a). Moreover, "public accommodation" is expansively defined and includes twelve

---

[6] Titles II and IV of the ADA prohibit disability discrimination by public entities and in telecommunications, respectively. See 42 U.S.C. § 12132; 47 U.S.C. § 225.

categories of places, ranging from "service establishment[s]," such as a "dry-cleaner" or "bank," to "place[s] of public display or collection," such as a "museum [or] library." Id. § 12181(7). Of particular relevance to this case, the term includes "place[s] of education," such as private secondary schools. Id. § 12181(7)(j).

Although Title III is expansive in its application, the remedies available under the title are narrow. Section 12188(a)(1) provides the remedial scheme for that title by incorporating the remedies available under Title II of the Civil Rights Act, see 42 U.S.C. § 12188(a)(1), which allows a "person aggrieved" to institute "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order," 42 U.S.C. § 2000a–3(a). We have stated that, "[b]y the plain terms of that provision, . . . damages for past harms are not available." Goodwin v. C.N.J., Inc., 436 F.3d 44, 51 (1st Cir. 2006). The only relief that is available is "preventive" injunctive relief. See id.

By contrast to Titles I or III, Title V does not protect disabled persons in a particular setting; instead, it includes an anti-retaliation provision, 42 U.S.C. § 12203(a)-(b),[7] that

---

[7] Title V also includes technical provisions, such as a rule of construction, see 42 U.S.C. § 12201, and a rule of severability, see id. § 12213.

protects individuals who exercise their rights under Titles I, II, or III from retaliation.  A Title V claim of retaliation thus must allege conduct protected under one of those earlier titles, and a retaliatory response to that protected conduct.  See Oliveras-Sifre v. P.R. Dep't of Health, 214 F.3d 23, 26 (1st Cir. 2000).

Section 12203(c) specifies the remedies available under Title V by reference to Titles I, II, and III.  It states:

> The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, Respectively.

42 U.S.C. § 12203(c) (emphasis added).  Sections 12117, 12133, and 12188, in turn, provide the separate remedial schemes for Titles I, II, and III.  See id. § 12117 (providing the remedial scheme for Title I, which concerns disability discrimination in the workplace); id. § 12133 (providing the remedial scheme for Title II, which concerns disability discrimination in public services); id. § 12188 (providing the remedial scheme for Title III, which concerns disability discrimination in places of public accommodation).

At issue is the meaning of that remedial scheme.  The family argues that any remedy or procedure available under sections

12117, 12133, or 12188 is available for the retaliation claim.[8] Section 12117, Title I's enforcement provision, allows damages claims. See 42 U.S.C. §§ 12117(a), 1981(a)(2). Conversely, the school argues that, because the family's Title V claim is premised upon the family's exercise of rights under Title III, only the remedy set forth in section 12188 (Title III's enforcement provision, which provides only for injunctive relief) applies.

## B. Analysis

"Where, as here, an issue turns on a question of statutory construction, 'the beginning point must be the language of the statute.'" Goodwin, 436 F.3d at 50 (quoting Riva v. Massachusetts, 61 F.3d 1003, 1007 (1st Cir. 1995)). "We assume that the words Congress chose, if not specially defined, carry their plain and ordinary meaning." In re Hill, 562 F.3d 29, 32 (1st Cir. 2009). If that meaning produces a plausible, unambiguous result, our inquiry is ordinarily at an end. See United States v. Gordon, 875 F.3d 26, 33 (1st Cir. 2017).

Looking to the plain language of § 12203(c), we find that the remedies available to the family are those set forth in § 12188 (the Title III remedial provision), and do not include

---

[8] The Fay School argues that the family did not request damages, nominal or otherwise, in connection with the retaliation claim before the district court. We assume arguendo, and favorably to the family, that it adequately preserved the issue of damages and nominal damages for the retaliation claim.

- 19 -

those provided for in § 12117 (the Title I remedial provision), or § 12133 (the Title II remedial provision).  We might conclude otherwise if § 12203(c) ended: "The remedies . . . under sections 12117, 12133, and 12188 . . . shall be available to aggrieved persons for violations of subsections (a) and (b) of this section."  Instead, the provision continues, " . . . with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively."  42 U.S.C. § 12203(c) (emphasis added).  We interpret "respectively" in § 12203(c) as it is commonly understood.  See United States v. Cortés-Cabán, 691 F.3d 1, 17 (1st Cir. 2012).  The commonly understood meaning of "respectively" is "in precisely the order given."  Respectively, Random House Webster's Unabridged Dictionary (2d ed. 1997); see also respectively, Macmillan Dictionary (online ed.), https://www.macmillandictionary.com/us/dictionary/american/respectively ("used for saying that something happens separately to each of the people or things mentioned in the order in which they were mentioned").  When "respectively" is used to describe "two or more items" it ordinarily indicates that "each [thing] relat[es] to something previously mentioned, in the same order as first mentioned."  respectively, Cambridge English Dictionary (2019),

https://dictionary.cambridge.org/us/dictionary/english/respective ly.

Applying this common meaning, the "respectively" language in § 12203(c) indicates that the remedies in §§ 12117, 12133, and 12188 apply separately and in the order stated "with respect to [Title] I, [Title] II and [Title] III of this chapter." 42 U.S.C. § 12203(c). Given this reading, a different set of remedies is available under Title V for retaliation depending upon the discriminatory practice opposed -- the remedies specified in § 12117 (Title I's enforcement provision) apply when the basis is Title I, the remedies in § 12133 (Title II's enforcement provision) apply when the basis is Title II, and the remedies in § 12188 (Title III's enforcement provision) apply when the basis is Title III.

Because here the underlying practice that was opposed is disability discrimination in a place of public accommodation, which is prohibited by Title III, see 42 U.S.C. § 12182(a), we look to Title III's enforcement provision, § 12188, to determine which remedies are available for the family's retaliation claim. See 42 U.S.C. § 12188(a)(1). As noted, those remedies are "[t]he remedies and procedures set forth in section 2000a-3(a)," the remedies provision of Title II of the Civil Rights Act, which does

not provide for compensatory damages.  Id.; see 42 U.S.C. § 2000a-3(a).

To adopt the family's interpretation that all of the remedies in Titles I, II, and III are available to enforce a retaliation claim -- including damages, regardless of the basis of the retaliation, would render the "respectively" language in § 12203(c) superfluous.  Such an interpretation is at odds with the basic interpretive canon that a statute ought to be construed so that "effect [is given], if possible, to every clause and word of a statute" so that "no clause, sentence, or word [is made] superfluous, void, or insignificant."  Duncan v. Walker, 533 U.S. 167, 174 (2001) (internal quotation marks omitted).

We also reject the family's argument that interpreting § 12203(c) to exclude compensatory damages as an available remedy for the Title V claim "would be contrary to legislative intent and the scheme of the ADA."[9]  To the contrary, Congress chose to allow a plaintiff to recover only injunctive relief for a discrimination

---

[9] The family cites several decisions of other circuit courts to support its interpretation of Title V's remedies provision. Those cases, however, concern the availability of damages for a retaliation claim premised upon conduct protected under Title I -- not Title III.  See, e.g., Salitros v. Chrysler Corp., 306 F.3d 562, 569-70 (8th Cir. 2002) (reasoning that there was sufficient evidence that the plaintiff engaged in protected activity and was retaliated against in the employment context such that a jury award of damages was proper).

- 22 -

action brought under Title III.  Goodwin, 436 F.3d at 49-51; see also Ruth Colker, ADA Title III: A Fragile Compromise, 21 Berkeley J. Emp. & Lab. L. 377, 377-78 (2000) (explaining that "the broad coverage of ADA Title III came at a price . . . .  In return for a broad list of covered entities, civil rights advocates agreed to a limited set of remedies").  Interpreting Title V's remedies provision as providing only injunctive relief for a Title V claim premised upon opposition to violations of Title III is thus entirely consistent with the scheme of the ADA.

Finally, the family's claim for nominal damages under Title V fares no better.  The applicable enforcement provision, § 12188, allows only forward-looking, injunctive relief.  Goodwin, 436 F.3d at 51 (concluding restitution is not an available remedy under Title III because it is a "retrospective remedy").  Nominal damages recognize a past wrong by providing plaintiffs "the moral satisfaction of knowing that a federal court concluded that [their] rights ha[ve] been violated in some unspecified way."  Farrar v. Hobby, 506 U.S. 103, 114 (1992).  They do not "fit into the taxonomy of 'preventive relief,' which is the only type of relief authorized by section 12188(a)(1)."  Goodwin, 436 F.3d at 51.

Accordingly, judgment for the school on the family's Title V claim was properly granted.  G's completion of the ninth

grade has mooted the claim for preventive injunctive relief, the only relief available to the family under that title.

## III.

We now turn to the family's appeal from summary judgment on the breach of contract and misrepresentation claims. Massachusetts substantive law governs these claims. See Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 724 (1st Cir. 1983); see also Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

We review a grant of summary judgment de novo. Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018). "We do this while 'drawing all reasonable inferences in favor of the non-moving party.'" Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018) (quoting Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)). Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Breach of Contract

The breach of contract claim is based on certain terms in the school's 2014/2015 handbook, which the family says formed a valid and binding contract between the school and G. To prevail on a breach of contract claim, a plaintiff must first show "that the parties reached a valid and binding agreement," such that a contract is formed. Coll v. PB Diagnostic Sys., Inc., 50 F.3d

1115, 1122 (1st Cir. 1995).  Such an agreement may be memorialized in a student handbook.  See Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998); Driscoll v. Bd. of Trs. of Milton Acad., 873 N.E.2d 1177, 1185 (Mass. App. Ct. 2007); see also Cloud, 720 F.2d at 724 (concerning contract claims based upon a university handbook under Massachusetts law).  To determine whether select terms of a student handbook are contractually enforceable, Massachusetts courts employ "the standard of 'reasonable expectation,'" that is, "what meaning the party making the manifestation . . . should reasonably expect the other party to give [the terms]."  Driscoll, 873 N.E.2d at 1185 (alteration in original) (quoting Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000)).  Vague and generalized representations are not contractually enforceable. See Santoni v. Fed. Deposit Ins. Corp., 677 F.2d 174, 179 (1st Cir. 1982); Blair v. Cifrino, 247 N.E.2d 373, 376 (Mass. 1969).

On appeal, the family argues that certain terms of the handbook constitute a sufficiently definite and certain agreement between the family and the school to be contractually enforceable. The family points to five pages of the 2014/2015 handbook, asserting that certain statements, "when read together," form a contract between the family and the school.  These pages contain, among other things, a general statement of the Fay School's "core values" (e.g., "Honesty, respect, responsibility, empathy, and kindness inform our conduct," "Mutual respect and civility are a

- 25 -

central aspect of healthy communities," and "All members of the Fay community are committed to making a positive difference in the world") and aspirational diversity statements (e.g., "We expect all members of the community to respect the rights of others and to behave appropriately at all times" and "Fay seeks to serve as a resource for understanding"). Without diminishing the importance of these words, they are exactly the sort of generalized, aspirational statements that are insufficiently definite to form a contract. See Shin v. Mass. Inst. of Tech., No. 020403, 2005 WL 1869101, at *7 (Mass. Super. Ct. June 27, 2005) (distinguishing well-defined procedures and policies, which can form contractual promises, from "generalized representations," which cannot).

Although acknowledging that the handbook includes some "aspirational statements" too indefinite to form a contractual promise, the family argues that select portions of the handbook are "sufficiently specific for reliance and thus for enforcement as contract promises." Specifically, the family argues that the statements that the Fay School would "help," "work with," and "respect" students "in physical need" are sufficiently definite statements to form a contract. Those specific statements, however, do not appear in the handbook pages cited by the family. See In re New Seabury Co. Ltd. P'Ship, 450 F.3d 24, 35 (1st. Cir. 2006) (explaining that "[c]ourts will not read language into a contract

- 26 -

where it does not appear").[10]  If the handbook did contain such language, a vague promise to "help" or "work with" students "in need" is not a "sufficiently definite promise to justify reasonable reliance."  Santoni, 677 F.2d at 179.  In short, the family fails to identify terms in the handbook that are sufficiently definite and certain to form a binding contract.  This understanding is reinforced by the enrollment contract that G's parents signed, which specifically states that the handbook "set forth general expectations regarding the Students' enrollment at the School," but "does not constitute a contract between [them] and the School." Summary judgment on the contract claim was therefore properly granted.

_____

[10] The family's brief states:

> [The family] relied upon . . . the assurance that Fay would help when students are "in physical need," "work with," and "respect" any such student.  Certainly, when read together, these were specific enough to create [reasonable reliance].

The family cites pages of the handbook for support.  Those pages include scattered references to "respect." ("[R]espect . . . inform[s] our conduct."; "Mutual respect and civility are central aspects of healthy communities."; "[W]e . . . [f]oster close relationships based on dignity and respect.").  Additionally, the pages contain the statement that "Fay [] students . . . [s]eek help when they are in . . . physical need."  These statements are not equivalent to the specific promises alleged by the family -- that the school will work with or help students in physical need.

## B. Misrepresentation

To prevail on the misrepresentation claim, the family must show that Fay made a false statement of material fact with knowledge of its falsity, which the family members reasonably relied on to their detriment. See Eureka Broadband Corp. v. Wentworth Leasing Corp._,_ 400 F.3d 62, 68 (1st Cir. 2005) (citing Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054 (Mass. 2002)); see also Cummings v. HPG Int'l, Inc., 244 F.3d 16, 23 (1st Cir. 2001) ("The issue is whether, at the time [the defendant] made the statements, [the defendant] knew that the statements were false.").[11]  The family bases the misrepresentation claim on the same 2014/2015 handbook language upon which it bases the breach of contract claim. See Br. for Family at 41 (citing the language "quoted above" as the basis for the misrepresentation claim).  We agree with the district court that the family has failed to raise a triable issue of fact as to whether Fay knowingly made false statements in its handbook.

---

[11] The district court treated the family's misrepresentation claim as a claim of willful or reckless misrepresentation, which requires a knowing scienter. See O'Connor v. Merrimack Mut. Fire Ins. Co., 897 N.E.2d 593, 600 (Mass. App. Ct. 2008). By contrast, a claim of negligent misrepresentation requires only a showing that a statement was made with a failure to exercise "reasonable care." Id. (quoting Nota Constr. Corp. v. Keyes Assocs., Inc., 694 N.E.2d 401, 405 (Mass. App. Ct. 1998)). On appeal, the family does not argue that its claim should be treated as a claim of negligent misrepresentation, and it agrees that the necessary scienter for the claim is "knowledge of falsity."

The 2014/2015 handbook states, "[R]espect, responsibility, empathy, and kindness inform our conduct."[12] The family argues that the contrast between this language of "respect" and "kindness" and the "mocking response" of school staff members, see supra Section I ("Blahahahahahaha"), is so egregious that it is evidence that the school knew that its handbook statements were false when the handbook was issued.

In context, the stray email comments, although perhaps dismissive or derisive, do not raise a triable issue of fact as to Fay's knowledge of falsity of its handbook representations. To the contrary, the school demonstrated receptiveness to Mother's concerns by examining Wi-Fi levels, confirming their safety, and, even without receiving full documentation of G's disability, altering its system of instruction and classroom orientation to accommodate G.

The family also argues that the handbook's "disclaimer" of contract liability, see supra Section I, is a sufficient basis

---

[12] We have doubts that these sorts of aspirational statements could support a misrepresentation claim. See Cummings, 244 F.3d at 21 ("There is an important threshold determination for any misrepresentation claim . . . . [O]nly statements of fact are actionable."); McEneaney v. Chestnut Hill Realty Corp., 650 N.E.2d 93, 96 (Mass. App. Ct. 1995) (statements concerning "matters of judgment" or "value" are not actionable for misrepresentation) (quoting Restatement (Second) of Torts § 538A (1977)). However, neither party argues about the nature of the language, and we therefore do not consider that question.

for a reasonable factfinder to conclude that Fay knew that the statements in its handbook were false when the handbook was issued. The family points to an article, written by the Fay School's lawyer in 2013, recommending that schools include such a disclaimer in their student handbooks because "carefully crafted disclaimer language may help your school avoid a claim that the handbook constitutes a contract between the school and its students." The family argues that this article is evidence that the school included a disclaimer in its student handbook because it knew that the statements in the handbook were false when the handbook was issued. But the family offers no evidence that anyone at the school ever saw or knew about that article. Moreover, the document, of questionable relevance, is unauthenticated, and therefore inadmissible at the summary judgment stage. See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) ("Documents supporting or opposing summary judgment must be properly authenticated."). The family offers no further evidence of the school's motivations for including a legal disclaimer in its handbook. The family cannot fend off summary judgment with "conclusory allegations [and] unsupported speculation." Rogan v. City of Bos., 267 F.3d 24, 27 (1st Cir. 2001).[13]

---

[13] The G family also appeals from the district court's exclusion of Dr. Hubbuch's testimony. See G, 282 F. Supp. 3d at 391. Although the family concedes the mootness of the accommodation claim, it argues that the testimony is not moot

- 30 -

**IV.**

For the foregoing reasons, we affirm the district court's entry of judgment for Fay.

So ordered.

---

because the testimony is relevant to the other claims. However, even if there was some relevance to that testimony before this appeal, the testimony is no longer relevant in light of this decision, affirming the entry of judgment on the family's remaining claims for reasons wholly unrelated to causation.